CHEMICAL BANK, Plaintiff-Appellee, v. AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, as Trustees, *et al.*, Defendants-Appellants.—CHEMICAL BANK, Plaintiff-Appellee, v. 666 ASSOCIATES *et al.*, Defendants-Appellants.

First District (3rd Division) Nos. 1—87—2659, 1—87—3592 cons.

Opinion filed February 15, 1989.—Rehearing denied April 11, 1989.

William J. Kunkle and Michael M. Marick, both of Phelan, Pope & John, Ltd., of Chicago, and Gerard E. Harper and Peter A. Sistrom, both of Paul, Weiss, Rifkind, Wharton & Garrison, of New York, New York, for appellants.

Glen H. Kanwit, William J. McKenna, Jr., and Mary Kay McCalla, all of Hopkins & Sutter, of Chicago, for appellee.

JUSTICE WHITE delivered the opinion of the court:

Defendant, CenTrust Trust (hereinafter CenTrust), appeals from a judgment and decree of foreclosure entered by the circuit court of Cook County on May 8, 1987, and from orders entered by the court on July 24, 1987, and October 29, 1987, respectively, denying Cen-

Trust's motion to vacate or modify the judgment and decree of fore-closure and confirming the foreclosure sale.[1] CenTrust maintains that plaintiff, Chemical Bank, was equitably estopped from asserting the priority of its mortgage liens in the mortgage foreclosure action. Cen-Trust also maintains that the circuit court erred in confirming the foreclosure sale because: (1) the court incorrectly calculated the inter-est due Chemical Bank; (2) the foreclosure sale took place while Cen-Trust's motion to vacate or modify the judgment and decree of fore-closure was pending; and (3) the foreclosure sale took place while mechanic's lien claims were pending. We find that these contentions are without merit, and we affirm the rulings of the circuit court.

FACTUAL BACKGROUND

In 1979, David L. Paul formulated a project to redevelop a large commercial building, located at 666 Lake Shore Drive, Chicago. The project was to convert the commercial building into condominiums, of-fices, retail and garage space. 666 Associates, an Illinois limited part-nership, was formed in 1979 to redevelop the building. Financing for the project was obtained from the Abacus Mortgage Investment Com-pany (hereinafter Abacus), which made a $70 million loan to American National Bank and Trust Company of Chicago (hereinafter American National Bank) as trustee[2] and 666 Associates. On November 20, 1980, American National Bank as trustee and 666 Associates exe-cuted a mortgage note whereby they promised to pay the sum of $70 million to Abacus. The note was secured by a mortgage of even date whereby American National Bank conveyed to Abacus all its rights, title and interest in the property, building and improvements at 666 North Lake Shore Drive (hereinafter the property).

On May 24, 1982, Abacus made an additional loan of $20 million to American National Bank as trustee and 666 Associates. The loan was evidenced by a mortgage note whereby American National Bank as trustee and 666 Associates agreed to pay the sum of $20 million to Abacus. The note was also secured by a mortgage whereby American National Bank as trustee conveyed to Abacus all of its rights, title and interest in the property.

---

[1] A notice of appeal was filed on behalf of CenTrust and defendant David L. Paul. The notice states that CenTrust and David L. Paul are appealing from the orders and decree listed above as well as "prior adverse rulings" of the circuit court of Cook County. However, David L. Paul has not filed a brief in this court. Also, CenTrust has not presented arguments to the court regarding the "prior adverse rulings." Conse-quently, this opinion will only consider the issues raised and briefed by CenTrust.

[2] 666 Associates was the sole beneficiary of the trust.

Abacus was the nominal lender in the loan transactions. Chemical Bank provided most of the money for the loans and later purchased the interest of Abacus in the loans. Hereinafter, all references to these loan transactions will describe Chemical Bank as the lender and mortgagee.

The project experienced financial difficulties because interest rates increased between the late 1970s and the early 1980s and the condominium market collapsed. By letter dated March 8, 1983, Mr. Paul proposed a "business plan" to deal with the project's financial problems. The "business plan" consisted of four parts: (1) 666 Associates would syndicate the West Tower apartments in the building; (2) 666 Associates would arrange a loan on the office, retail and garage sections of the building; (3) 666 Associates would sell individual units in the east section of the building as condominiums; and (4) 666 Associates would sell individual units in the south section of the building as condominiums. Chemical Bank agreed to this program. Consequently, in 1983, 666 Associates sold the West Tower apartments in the building. Chemical Bank released its mortgage on that portion of the building, and, in return, received $10 million and a pledge of a $13,500,000 purchase money note. 666 Associates was also successful in obtaining a loan from Homestead Savings Bank on the office and commercial space in the building. The loan was in the principal amount of $11 million. However, under the loan agreement, 666 Associates could obtain extensions of the loan up to $25 million.[3] The loan was secured by a first mortgage in the office, retail and commercial garage portions of the property.[4]

In May 1983, Mr. Paul requested that Chemical Bank apply the proceeds from condominium sales first to the payment of interest on the Chemical Bank loans and second to the payment of principal.[5] Chemical Bank agreed to this arrangement. However, officers of Chemical Bank testified that this arrangement was to be at Chemical Bank's discretion.

Also in early 1983, Chemical Bank and David L. Paul discussed the need for an additional investment in the project by 666 Associ-

---

[3] As of March 26, 1987, the amount disbursed under the loan agreement was $11,084,325.08.

[4] Chemical Bank subordinated its interests in those sections of the property to the interest conveyed to Homestead Savings Bank. Chemical Bank has since acquired Homestead Savings Bank's interest in the property.

[5] Mr. Paul testified that the proceeds from the sales of condominiums were to be applied first to payment of interest, second to tenant improvements and third to payment of principal.

ates. By letter dated April 15, 1983, Chemical Bank advised Mr. Paul that the loan to 666 Associates was "out of balance," and this condition would trigger a default under the loan documents unless 666 Associates contributed additional funds to the project. Mr. Paul approached the limited partners of 666 Associates, including the Westport Company,[6] the predecessor to CenTrust, for additional funds, either in the form of an investment or a loan. The limited partners refused to invest additional monies in the project. However, the Westport Company agreed to make a loan to 666 Associates, subordinate to the loans from Chemical Bank. The minutes of the Westport Company trustees meeting of May 20, 1983, reflect that the trustees approved a loan to 666 Associates on that date. Mr. Paul did not vote on the loan because of his position with 666 Associates and the possible conflict of interest. The loan documents from the Westport Company were formally executed on August 15, 1983. They provided that the Westport Company would make a loan of $7,300,000[7] to 666 Associates, to be repaid in August 1985. Interest was to be charged at the rate of prime plus 4% per annum until the date of maturity, and, thereafter, at a rate equal to the lesser of (1) 20% per annum or prime plus 4% per annum, whichever is higher, and (2) the highest rate of interest then permitted by law. The loan was secured by a junior mortgage on the premises. All proceeds from the loan were disbursed by March, 1984.

In early 1983, Mr. Paul and the shareholders of the Westport Company proposed to acquire Dade Savings & Loan Association. The acquisition contemplated that, with the approval of the Federal Home Loan Bank Board, the shareholders of the Westport Company would exchange their stock for stock of Dade Savings & Loan Association. The Westport Company would then become a subsidiary of Dade Savings & Loan Association.[8] In July 1983, Mr. Paul had several conversations with officers of Chemical Bank regarding the acquisition. Mr. Paul testified that he was concerned that an officer of Chemical Bank had made certain remarks indicating that Chemical Bank was having problems with the loan to 666 Associates. Chemical Bank denied that any of its officers had made such comments. Also in July, Mr. Paul

---

[6] The circuit court found that the Westport Company owned 51% of the limited partnership interest in 666 Associates.

[7] The Westport Company charged a loan fee of $800,000 on the loan. Consequently, the actual proceeds of the loan were $6,500,000.

[8] The transaction was consummated in November 1983. Dade Savings & Loan Association is now CenTrust Savings Bank and is the parent corporation of CenTrust Trust.

requested that Chemical Bank provide a letter to the Federal Home Loan Bank Board regarding the status of the loan to 666 Associates. By letter dated July 21, 1983, Chemical Bank informed the Federal Home Loan Bank Board that the loan to 666 Associates was not in default and that 666 Associates and Mr. Paul were valued customers of Chemical Bank. Mr. Paul testified that a copy of this letter was sent to the Westport Company trustees.

In spite of the additional monies from the loans and syndication of the West Tower Apartments, the project's financial difficulties persisted. In late 1983 or early 1984, Mr. Paul recommended additional syndications of portions of the project. The syndication proposals were rejected by Chemical Bank because they provided for low or no down payments and required Chemical Bank to take a cash flow mortgage at less than market interest rates.

666 Associates fell behind in its payments to Chemical Bank, and on August 29, 1984, Chemical Bank declared the $70 million and $20 million loans in default. On December 7, 1984, Chemical Bank commenced foreclosure proceedings. 666 Associates then filed a petition for bankruptcy. The foreclosure action was automatically stayed under section 362(a) of the Bankruptcy Code (11 U.S.C. §362(a) (1984)). However, on April 25, 1985, Chemical Bank moved for relief from the automatic stay. After trial before the bankruptcy judge, an order was entered directing that the stay be lifted as to any party and interest seeking to enforce its lien rights in or against the property. Chemical Bank then proceeded with the foreclosure action, obtained a judgment and decree of foreclosure, and a sale of the property.

EQUITABLE ESTOPPEL

CenTrust asserts that "[a]t the time it[9] agreed to make its loan, and while it was funding the loan, [it] reasonably believed, and was induced by Chemical to believe, that Chemical would follow the practices it had adopted in the business plan—using cash proceeds for interest and improvements—which were critical if the Project was to survive." CenTrust maintains that Chemical Bank should be estopped from asserting the priority of its mortgage liens in the foreclosure action.

Equitable estoppel arises where the voluntary conduct of one party precludes that party from asserting rights against another

---

[9]The loan was actually made by the Westport Company. However, since the Westport Company was the predecessor of CenTrust, the parties, and this court, refer to CenTrust as the lender.

person who has, in good faith, relied upon such conduct to change his position for the worse. (*Budget Premium Co. v. American Casualty Co.* (1985), 136 Ill. App. 3d 682, 686, 483 N.E.2d 389; *Matzen v. Matzen* (1979), 69 Ill. App. 3d 69, 72, 387 N.E.2d 14.) In order to invoke the doctrine of equitable estoppel, the party asserting the existence of the estoppel must prove six elements:

> (1) words or conduct by the party against whom the estoppel is alleged amounting to a misrepresentation or concealment of material facts;

> (2) the party against whom the estoppel is alleged must have knowledge, either actual or implied, at the time the representations were made, that they were untrue;

> (3) the truth respecting the representations so made must be unknown to the party claiming the benefit of the estoppel at the time they were made and at the time they were acted on by him;

> (4) the party estopped must intend or expect that his conduct or representations will be acted on by the party asserting the estoppel or by the public generally;

> (5) the representations or conduct must have been relied and acted on by the party claiming the benefit of the estoppel; and

> (6) the party claiming the benefit of the estoppel must have so acted, because of such representations or conduct that he would be prejudiced if the first party is permitted to deny the truth thereof.

(*Union National Bank & Trust Co. v. Carlstrom* (1985), 134 Ill. App. 3d 985, 989-90, 481 N.E.2d 300; *National Tea Co. v. 4600 Club, Inc.* (1975), 33 Ill. App. 3d 1000, 1003, 339 N.E.2d 515.) Proof of these six elements must be clear, precise and unequivocal. *In re Marriage of Schaefer* (1987), 161 Ill. App. 3d 841, 847, 515 N.E.2d 710; *National Tea Co.*, 33 Ill. App. 3d at 1003.

■ In the instant case, the circuit court found that the Westport Company did not rely upon any statement or conduct of Chemical Bank in deciding to make the subordinated loan. Thus, the circuit court refused to estop Chemical Bank from asserting the priority of its liens. We believe that the record amply supports the finding of the circuit court. The Westport Company trustees resolved to make the loan to 666 Associates on May 20, 1983. The letter from Chemical Bank to the Federal Home Loan Bank Board, upon which CenTrust relies to prove the estoppel, was not written until July 21, 1983. Additionally, none of the Westport Company trustees who approved the loan testified that they relied on the letter to the Federal Home Loan

Bank Board, or on the business plan as stated in Mr. Paul's letter to Chemical Bank of March 8, 1983. There was also no testimony that the Westport Còmpany trustees who approved the loan relied on the arrangement that the funds from sales of condominiums would be applied first to interest due on the loans, second to tenant improvements and third to principal. The burden was upon CenTrust to prove reliance by clear, precise and unequivocal evidence. This, it failed to do.

CenTrust would have us look to the actions of Mr. Paul in determining the existence of estoppel. Mr. Paul testified at trial that he presented the proposal for the loan to the Westport Company trustees. He participated in the telephone meeting at which the Westport Company trustees approved the loan. He advised the trustees that the Chemical Bank loans were not in default, that the relationship between Chemical Bank and 666 Associates was cordial and that 666 Associates expected that Chemical Bank would continue to manage the loans in the same manner. Mr. Paul also testified that he would not have presented the proposal for the loan to the Westport Company trustees had he believed that Chemical Bank would not continue to fund tenant improvements or had he not seen the letter to the Federal Home Loan Bank Board. However, Mr. Paul was impeached with prior deposition testimony. In his deposition, Mr. Paul testified as follows:

> "QUESTION: You wouldn't know what representations were made to Westport regarding the loan?
>
> ANSWER: I think I saw a copy after the fact of the loan presentation that Alan Merkur made to the trustees of that trust, but I purposely did not go to that Board meeting. I was not involved in the deliberations of making the loan."

The circuit court heard the testimony of the witnesses, observed their demeanor at trial, and concluded that CenTrust failed to show that the Westport Company trustees relied upon any statement or conduct of Chemical Bank in approving the loan. The circuit court's ruling was not against the manifest weight of the evidence and must be affirmed. See *Pantle v. Industrial Comm'n* (1975), 61 Ill. 2d 365, 335 N.E.2d 491; *National Tea Co.*, 33 Ill. App. 3d at 1004; *Armstrong v. Ingram* (1972), 7 Ill. App. 3d 370, 373, 287 N.E.2d 532.

CenTrust maintains that the circuit court found that the Westport Company trustees relied on the letter of the Federal Home Loan Bank Board and that Chemical Bank was equitably estopped from foreclosing its mortgage liens for a reasonable period of time following the Westport loan. CenTrust ignores the written findings of

fact and conclusions of law adopted by the circuit court and focuses upon certain statements made by the court at the conclusion of trial. We believe that the circuit court's position, as stated at trial and in its findings of fact and conclusions of law, was that the Westport Company trustees did not rely upon any conduct or statement of Chemical Bank in deciding to make the subordinated loan. However, the circuit court noted at trial that the Westport Company trustees knew that the business plan would not last indefinitely and even if the trustees had relied on the business plan, they could have done so only for a reasonable time. The court noted further that Chemical Bank allowed a reasonable time to elapse prior to declaring the loans in default.[10] The circuit court's comments at trial were not inconsistent with its holding that the Westport Company trustees did not rely upon any conduct or statement of Chemical Bank. Instead, the circuit court stated an additional, independent reason why equitable estoppel should not apply—that is, a reasonable time had elapsed before Chemical Bank declared the loans in default.

CALCULATION OF INTEREST DUE CHEMICAL BANK

The $70 million note and mortgage provide that, in the event of default, 666 Associates shall pay interest at a rate equal to the greater of 20% per annum, or the "Applicable Interest Rate" (defined as 1.80% per annum plus the prime rate of interest charged by Chemical Bank). The $20 million note and mortgage provide that, in the event of default, 666 Associates shall pay interest at a rate equal to the greater of 25% per annum, or 5% per annum plus the "Applicable Interest Rate." CenTrust asserts that these provisions for higher interest are not reasonably related to any damages that Chemical Bank sustained upon default and constitute penalty clauses. CenTrust maintains that the circuit court erred when it decided that Chemical Bank was entitled to interest at the default rates from the date that the loans were declared in default. We are of the opinion that the provi-

---

[10]The proposal for the business plan was made in March 1983. Chemical Bank did not declare the loans in default until August 1984, just four months before the loans were due. At the time Chemical Bank declared the loans in default, 666 Associates owed $4,059,161.06 in interest, sales of individual condominium units were slow, and further syndication of portions of the building did not appear realistic since the proposals for syndication provided low or no down payments and required that Chemical Bank take a cash flow mortgage at interest rates which would be below market. These facts support the circuit court's comment at trial that the Westport Company trustees could not reasonably believe that Chemical Bank would not foreclose on its liens.

sions for higher interest upon default are valid and enforceable.

In *Baker v. Loves Park Savings & Loan Association* (1975), 61 Ill. 2d 119, 333 N.E.2d 1, the plaintiffs filed an action seeking a declaration that a clause in a promissory note was unlawful and unenforceable. The clause provided that "upon any default upon this obligation, or the instrument securing it, interest at the rate of one per cent (1%) per annum above the original rate provided herein on the unpaid balance of this indebtedness may be charged for the period of such default." The plaintiffs argued that the clause was a penalty provision. The Illinois Supreme Court rejected this contention and upheld the validity of the clause. In so holding, the court observed:

> "The charge of the additional 1 percent interest may be triggered by any default upon the note or the mortgage. In addition to the covenant not to sell the property without the consent of the mortgagee, the mortgage contains several other covenants, such as: to pay taxes, to keep the improvements insured, not to commit waste, etc. A breach of any one of these covenants may bring about the increased interest charge. We do not consider this increase to be a penalty. [Citation.] Instead, as in the early Illinois cases cited above, we view this as a provision for liquidated damages for a breach of the covenant. The increase in the interest rate is not unreasonable. The additional charge is not for a fixed amount and does not relate back to be computed from a time prior to the breach. Rather it is computed at the stipulated rate only from the date of default and is charged only for the duration of the default. It would appear that actual damages for a breach of any of these covenants would be uncertain and difficult to ascertain or prove. Under these circumstances it would seem appropriate that the parties should agree on an increase in the interest rate as liquidated damages for a breach of a covenant in the mortgage. [Citations.]" *Baker*, 61 Ill. 2d at 128.

The decision of the Illinois Supreme Court in *Baker* is controlling in the present case. As in *Baker*, the provisions for higher interest contained in the notes and mortgages for the $70 million and $20 million loans may be triggered by any default upon the notes or the mortgages including the failure to pay taxes, the failure to keep the premises insured, and the failure to pay any portion of the loans within 10 days after the same is due. The additional interest charges are not for fixed amounts and do not relate back to a time prior to the date of default. Rather, interest is calculated at the higher rates only from the date of default. As in *Baker*, it would appear that, in

the event of default under the $70 million and $20 million loans, actual damages would be uncertain and difficult to ascertain or prove. Thus, it was appropriate for Chemical Bank and 666 Associates to agree on increases in the interest rate as liquidated damages in the event 666 Associates defaulted under the loans.

CenTrust attempts to distinguish *Baker* on the ground that Chemical Bank's "damages from default—nonpayment of interest—are precisely ascertainable." This argument ignores the fact that the higher interest rates provided in the $70 million and $20 million notes and mortgages may be triggered by any default upon the notes and mortgages. We refuse to hold that the provisions for higher interest are enforceable if, for example, the default consists of failure to maintain insurance on the property but are not enforceable if the default consists of failure to pay the interest and principal due under the notes and mortgages.

██ CenTrust also attempts to distinguish *Baker* by arguing that the default rates under the $70 million and $20 million notes and mortgages are "wildly out of line with the market" rates[11] and are not at all similar to the "minor increase" from 6% to 7% that was upheld in *Baker*. We do not believe that *Baker* should be construed so narrowly. In *Baker*, the Illinois Supreme Court cited *Bane v. Gridley* (1873), 67 Ill. 388, and *Walker v. Abt* (1876), 83 Ill. 226, for the proposition that an increased interest payment after maturity is not a penalty but is considered as liquidated damages. In *Bane v. Gridley*, the court upheld a provision in a promissory note which required the debtor to pay interest at the rate of 30% per annum after maturity. The *Walker v. Abt* decision upheld a provision in a note increasing the interest rate from 10% per annum to 20% per annum upon maturity of the note. We realize that *Bane v. Gridley* and *Walker v. Abt* predate the usury laws and do not have precedential value to the extent that they allowed lenders to receive interest in excess of the usury provisions. However, these cases provide support for our holding that the provisions for higher interest in the $70 million and $20 million notes and mortgages are valid and enforceable.

We find further support for our holding in the case of *Casaccio v.*

---

[11]It is not disputed by CenTrust that, at the time 666 Associates executed the $70 million mortgage note, the "Applicable Interest Rate" was approximately 22% per annum. Thus, a provision that, in the event of default, interest would be charged at a rate equal to the greater of the "Applicable Interest Rate" or 20% per annum was not "wildly out of line with the market." We also note that the Westport Company loan and mortgage documents, which CenTrust is seeking to enforce, effectively provide for an interest rate of 20% per annum, upon maturity or default.

*Habel* (1973), 14 Ill. App. 3d 822. Defendant Habel borrowed $122,000 for one year at 18% interest. Under the terms of the loan agreement, he promised to pay interest at the rate of 24% per annum upon default. Habel maintained that plaintiffs were liable for the interest payments because he was acting on their behalf when he entered into the loan transaction. This court held that plaintiffs were not party to the loan agreement and were not liable for the high rate of interest. However, this court stated that "Habel must bear the burden of the high interest rates because he entered into such an agreement." Accordingly, this court affirmed the circuit court's judgment that Habel was liable for interest at the rate of 24% per annum from the date of default.

■ CenTrust next argues that the circuit court was obliged to adhere to the Bankruptcy Code in computing interest due Chemical Bank because 666 Associates was in bankruptcy from December 18, 1984, through the date of the circuit court's judgment. CenTrust maintains that, under the Bankruptcy Code, Chemical Bank "would be entitled only to interest either at a statutory rate *** or at a reasonable contract rate." CenTrust has not cited, and we have not found, any authority for the proposition that the circuit court was required to follow the Bankruptcy Code. We note that, in its order dated July 11, 1985, the bankruptcy judge found that 666 Associates lacked equity in the property, and lifted the automatic stay, thus enabling Chemical Bank to proceed with the foreclosure proceedings. We also note that the real issue in the foreclosure proceedings has been whether Chemical Bank should be equitably estopped from asserting the priority of its mortgages, so that CenTrust would be paid first out of the proceeds of the foreclosure sale. We do not see why the Bankruptcy Code should apply to a dispute which essentially involves only creditors of 666 Associates and not 666 Associates itself.

666 Associates is a sophisticated entity and should have been aware of the terms and effects of the mortgage notes that it executed. A party is ordinarily bound by the terms of its contracts. We see no reason to relieve 666 Associates from the higher interest provisions that it agreed to. We believe that the circuit court properly calculated the interest due Chemical Bank under the notes and mortgages, and we affirm the finding of the court.

PENDING MOTION

CenTrust's next argument is that the circuit court erred in confirming the foreclosure sale because the sale took place while CenTrust's motion to vacate or modify the judgment and decree of fore-

closure was pending. We reject this argument.

On June 16, 1987, the circuit court held a hearing on CenTrust's motion to vacate or modify the judgment and decree of foreclosure. At the hearing, counsel for CenTrust indicated to the circuit court that Mr. Gerald Harper, the partner in charge of the CenTrust litigation, and Mr. McNulty, an associate familiar with the litigation, would be leaving town later that week and would not return until the middle of July. Counsel for CenTrust requested that the hearing on the motion be held the week of July 20. Counsel for Chemical Bank expressed his concern that the foreclosure sale could not take place as scheduled[12] because of the delay in the hearing on the motion. The following discussion then took place:

"[COUNSEL FOR CHEMICAL BANK]: The only problem I have with conducting the sale without disposing of the motion is that 2—1203(b) *** says timely filing of a motion shall stay enforcement of a judgment. And, if the other side would agree to allow us to proceed with the sale and perhaps just hold off confirmation of the sale pending disposition of sale [*sic*], then fine.

THE COURT: I think you'll have to do that because, if the priorities change, somebody might want to have a new sale—

[COUNSEL FOR CHEMICAL BANK]: Sure, if there's a way to conduct the sale and then hear this motion upon the return of Mr. Harper and Mr. McNulty from their respective vacations, fine, I don't have any objection to working it out.

THE COURT: But at the same time the sale, you know, if the sale does go forward it shouldn't impact on the motion and you shouldn't be able to argue that the motion should be denied, obviously, because the sale has already been held, et cetera.

[COUNSEL FOR CHEMICAL BANK]: Absolutely, I have no problem with that at all. But the question is will this defendant waive its right under 2—1203 to claim, under the timely filing of the motion, enforcement of the judgment is stayed.

* * *

[COUNSEL FOR CENTRUST]: But, I don't see any problem with going ahead with the sale as your Honor suggests and see how things transpire with respect to the post-trial motions when we are here before your Honor."

The circuit court then allowed the sale to proceed.

---

[12]The foreclosure sale had been scheduled for June 18, 1987.

■■ ■ Counsel for Chemical Bank was concerned that a foreclosure sale would be considered a procedure enforcing the judgment and would be stayed, pursuant to section 2—1203 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1203), pending disposition of CenTrust's motion to vacate or modify the judgment and decree of foreclosure. Section 2—1203 provides that a motion to modify or vacate a judgment stays enforcement of the judgment. However, we need not here decide whether the foreclosure sale should have been stayed pending disposition of CenTrust's motion to vacate or modify the judgment and decree of foreclosure. We believe that the error, if any, that was committed by the circuit court when it allowed the sale to proceed was invited by counsel for CenTrust. Counsel advised the circuit court that he did not "see any problem with going ahead with the sale." CenTrust is estopped from arguing to this court that the circuit court erred in allowing the sale to proceed. See *Blancett v. Taylor* (1955), 6 Ill. 2d 434, 128 N.E.2d 916 (plaintiffs were estopped to complain that the master did not comply with the terms specified in the decree of sale where the master changed the terms of the sale at the request of plaintiffs' attorney).

CenTrust maintains that it did not waive this argument because it agreed to allow the sale to proceed only after the circuit court declared that the sale would be without prejudice to any of its rights. The holding of the circuit court was that the foreclosure sale would be without prejudice to Centrust's motion to vacate or modify the judgment and decree of sale. The court did not want Chemical Bank to argue that CenTrust's motion should not be heard because the sale had taken place. However, the issue here is not whether CenTrust has waived any argument that it made in the motion. The issue is whether, after agreeing to allow the sale to proceed, CenTrust could then argue that the sale should not have taken place while the motion was pending. We believe that it could not.

PENDING MECHANIC'S LIEN CLAIMS

Lastly, CenTrust argues that the foreclosure sale should not have taken place while the mechanic's lien claims were unresolved. We believe that CenTrust has also waived this argument.

On February 6, 1986, Chemical Bank filed a motion to stay litigation of the mechanic's lien claims in the foreclosure action and compel their resolution in a mechanic's lien foreclosure action pending before Judge LaPorta. Chemical Bank proposed that the circuit court enter an order severing the mechanic's lien claims from the foreclosure action but providing that any judgment of foreclosure or foreclosure

sale be subject to a determination of the validity, priority and extent of mechanic's lien claims in the action before Judge LaPorta. On March 11, 1986, the circuit court held a hearing on Chemical Bank's motion. Early in the hearing, the court asked if there were any objections to the motion. Counsel for CenTrust did not state an objection. Later in the hearing, counsel for CenTrust advised the court: "Again, we don't really have any objections to this although I believe our office has been in contact with [counsel for Chemical Bank], and we have some minor problems with the proposed order that we can probably work out." Subsequently, the circuit court entered an order which provided that the mechanic's lien claims would be litigated before Judge LaPorta. The order also provided that any sale of the property, pursuant to a judgment or decree entered in the foreclosure action, would be subject to all valid existing mechanic's liens on the property, and would not discharge or extinguish the mechanic's liens.

■■ The parties to the hearing recognized that a decree of foreclosure might be entered in the foreclosure proceedings, and a foreclosure sale might take place, prior to resolution of the mechanic's lien claims. The order of the circuit court reflected this understanding and provided that a sale of the property would be subject to the mechanic's liens. CenTrust did not object to the severance of the mechanic's lien claims from the foreclosure and must have recognized that the foreclosure action might be resolved prior to the mechanic's lien claims. Indeed, CenTrust stated that it did not "really have any objection to" the severance. We believe that CenTrust is estopped to argue that the foreclosure sale could not proceed because of the pendency of the mechanic's lien claims.

We have considered the arguments raised by CenTrust, and we conclude that the circuit court properly found that Chemical Bank was not estopped from asserting the priority of its liens and properly confirmed the foreclosure sale. We, therefore, affirm the judgment of the circuit court.

Affirmed.

FREEMAN, P.J., and RIZZI, J., concur.