**DACON BOLINGBROOK ASSOCIATES LIMITED PARTNERSHIP,**
Appellant,

v.

**FEDERAL NATIONAL MORTGAGE ASSOCIATION, Appellee.**

Nos. 92 C 8316, 93 C 237.

United States District Court,
N.D. Illinois, E.D.

May 26, 1993.

David K. Welch, Dannen Crane Heyman & Simon, Chicago, IL, for appellant.

James S. Laing, Keck Mahin & Cate, Chicago, IL, for appellee.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Dacon Bolingbrook Associates Limited Partnership ("Dacon") has taken two appeals from decisions of Bankruptcy Judge Eugene Wedoff: one refusing to confirm Dacon's reorganization plan under Chapter 11 of the Bankruptcy Reform Act of 1978 ("Code"), 11 U.S.C. §§ 1101–1174,[1] and the other converting what had been a Chapter 11 reorganization into a Chapter 7 liquidation. Dacon's appeals have been consolidated before this Court. For the reasons stated in this memorandum opinion and order, both of the Bankruptcy Court's orders are affirmed.

### Facts [2]

In April 1989 Dacon (an Illinois limited partnership) purchased Brentwood Apartments ("Brentwood")[3] in Bolingbrook, Illinois from Incor Properties, Inc., an affiliate of Inland Real Estate. Though the purchase price came to $15.5 million, Dacon obtained $18.5 million in financing through Green Park Financial ("Green Park") to cover transaction costs and anticipated renovation expenses as well. On April 10, 1989 Dacon and Boulevard Bank N.A., as trustee under a land trust agreement, executed a Note, Mortgage and related documents in favor of Green Park to evidence and secure that indebtedness.[4]

Some added background explanation is needed to understand the position occupied in the transaction by Federal National Mortgage Association ("Fannie Mae"). In the spring of 1988 Fannie Mae had launched its Delegated Underwriting and Servicing Program ("DUS Program"), under which certain approved lenders ("DUS lenders") would underwrite mortgage loans that they would then sell to Fannie Mae. Those lenders would also execute loss sharing agreements under which they would agree to share Fannie Mae's risk of loss in consideration of compensation paid to them by Fannie Mae.

Green Park was an approved DUS lender. In accordance with the DUS program, it assigned and endorsed the Dacon Note and assigned the Mortgage and related documents to Fannie Mae on the same April 10, 1989 date as the closing of the loan to

---

1. Further citations to individual Code sections will follow Title 11's internal numbering and take the form "Section—."

2. This section provides most of the background of the current dispute. Some additional particulars are set forth as necessary in the later text of this opinion.

3. Brentwood comprises 15 buildings containing 789 units, 10 garage buildings, a swimming pool and a clubhouse (Dacon Ex. 9 at 15).

4. Those documents are reproduced in Dacon Ex. 10.

Dacon. Green Park remained in the picture as servicer of the loan, so that all Dacon payments were required to be made to it rather than to Fannie Mae.[5] Green Park and Fannie Mae also executed an April 13, 1989 loss sharing agreement (the "Agreement," FNMA Ex. 25) that required Green Park not only to share in any losses but also to make certain advances to Fannie Mae whether or not Dacon met its payment obligations. To be precise, Agreement §§ 5.02 and 5.03 required Green Park to remit from its own resources principal, interest and escrow payments to Fannie Mae when Dacon failed to make those payments to Green Park.

Dacon met its first four debt service payments but stopped making full payments in October 1989 (FNMA Exs. 14–15).[6] Dacon remained unable to meet those monthly payments thereafter, and it sought to negotiate a workout of its cash flow problems with Fannie Mae and Green Park (Nov. 3, 1992 Tr. 194–95).

Those negotiations resulted in a January 25, 1990 letter agreement (the "Letter Agreement," FNMA Ex. 27) that in part contemplated that Dacon would make partial payments and that Fannie Mae would not assert its late payment rights.[7] But those promises were specifically conditioned on execution of an express forbearance agreement to be entered into on the formal restructuring of the loan.[8] Though the parties extended the period for entering into such a formal forbearance agreement five times, they never executed that document (Nov. 3 Tr. 176, 198–204; FNMA Mem. 14).

In August 1992 Fannie Mae and Green Park executed still another agreement (FNMA Ex. 26, the "Settlement Agreement"). Green Park, which had covered the shortfall on Dacon's debt service payments to the tune of over $2.8 million, received almost $760,000 from Fannie Mae and was relieved of further obligations as a DUS lender as to Dacon's loan.[9]

Dacon petitioned for bankruptcy on September 10, 1991 and since then has conducted its business as debtor in possession. Early in November 1992 the Bankruptcy Court approved Dacon's disclosure statement and held two days of evidentiary hearings (the "confirmation hearing") on Dacon's Third Amended Plan of Reorganization ("Plan").

On November 6, 1992 the Bankruptcy Court allowed Fannie Mae's claim in the amount of $20,883,811.80. Judge Wedoff also denied confirmation of Dacon's Plan on two grounds:

1. It failed to satisfy the voting requirements of Section 1129(a)(10).

2. It was unfeasible and hence violated Section 1129(a)(11).

Consequently the Bankruptcy Court granted Fannie Mae's motion to convert Dacon's Chapter 11 reorganization to a Chapter 7

---

**5.** Green Park's general partner Walker & Dunlop Multifamily, Inc. ("Walker & Dunlop") actually performed the servicing function.

**6.** Walker & Dunlop then notified Dacon in writing that a default had occurred.

**7.** Those rights, discussed later, included an acceleration right, a late payment charge and a higher interest rate.

**8.** Letter Agreement ¶¶ 20 and 22 provided:

20. *Breach or Termination of This Letter Agreement*
In the event of Borrower's [Dacon's] breach of this letter agreement prior to the complete execution of the Forbearance Agreement, or if this letter agreement shall terminate pursuant to its own terms prior to the complete execution of the Forbearance Agreement, Borrower shall be obligated to immediately pay Fannie Mae all arrearages due under the Note and Mortgage, and Fannie Mae shall retain all rights and remedies provided in the original Note and Mortgage.
22. *The Forbearance Agreement*
The Forbearance Agreement must be executed by Borrower, Lender [Green Park] and Fannie Mae within 90 days after the signing of this letter agreement by Fannie Mae, failing which this letter agreement shall be terminated, unless Borrower, Lender and Fannie Mae shall mutually agree to an extension. If this letter agreement is terminated, Borrower's obligations under the Note, the Mortgage and related documents shall continue as if this letter agreement never took effect.

**9.** Until August 1992 Green Park had made the payments due under the Note as required by the original Agreement. Those payments ceased after Green Park and Fannie Mae executed the Settlement Agreement.

liquidation. Those orders led to the current appeals, which this Court has jurisdiction to review pursuant to 28 U.S.C. § 158(a).

### Standard of Review

■ Dual standards of review govern bankruptcy appeals. To the extent that the Bankruptcy Judge has made findings of fact, Bankruptcy Rule ("B. Rule") 8013 mandates that those findings cannot be set aside unless clearly erroneous. However, that deferential standard does not apply to the Bankruptcy Court's conclusions of law, reviewed by this Court de novo (*In re Ebbler Furniture & Appliances, Inc.*, 804 F.2d 87, 89 (7th Cir.1986)), or to mixed questions of fact and law—that is, to the manner in which factual conclusions implicate legal questions (*id.*). This case turns principally on questions of contract interpretation and other mixed questions that also receive de novo review (*In re Robert B. Lee Enterprises*, 980 F.2d 606, 607 (9th Cir.1992)).[10]

**10.** Fannie Mae argues with considerable persuasiveness that a number of Judge Wedoff's rulings are wholly factual and are thus entitled to deferential review under the "clearly erroneous" standard. Because this Court agrees with all of Judge Wedoff's determinations on the merits (that is, in de novo terms), it follows a fortiori that they would also be affirmed if "clearly erroneous" were the test. So it is unnecessary to decide whether any of the issues are purely factual rather than mixed questions.

**11.** Dacon's memorandum first advances the argument that the Bankruptcy Court erred in approving Fannie Mae's claim—specifically, that Judge Wedoff should not have allowed default interest and late payment charges that inflated Fannie Mae's claim. Because propriety of the claim valuation is a component of the confirmation analysis, this opinion need not address that argument separately.

**12.** Dacon Mem. 33 argues that reversal is in order if this Court reverses the Bankruptcy Court's feasibility ruling because of a disagreement with that Court's determination under Section 1129(b)(2)—specifically, its setting of an interest rate for the calculation under Section 1129(b)(2)(A)(i)(II):

> Should this Court reverse the rulings of the Bankruptcy Court, in whole or in part, with respect to the allowance of ... the applicable discount rate, feasibility will once again become an issue.

### Denial of Confirmation

Dacon complains that the Bankruptcy Court should clearly have approved the Plan.[11] Fannie Mae counters that the Plan was unconfirmable for the alternative reasons set forth by the Bankruptcy Court. Because confirmation was properly denied on the ground that no class of creditors entitled to vote for the Plan did so, this opinion need not reach the feasibility issue.[12]

Section 1128 requires the Bankruptcy Court to hold a hearing on whether a plan should be confirmed and authorizes parties in interest to object to confirmation. And Section 1129(a) conditions approval of a plan on satisfaction of the requirements of each of its subsections.[13] After holding the two-day confirmation hearing, Judge Wedoff concluded that Dacon's Plan failed to satisfy either Section 1129(a)(10) (the voting requirement) or Section 1129(a)(11) (the feasibility requirement).

What Dacon fails to grasp is that under Section 1129(b)'s own terms it does not apply unless *all* of the Section 1129(a) requirements (with the possible exception of Section 1129(a)(8)) have been met. And that means that a failure to satisfy Section 1129(a)(10) is fatal to the Plan (see n. 15). All the same, this Court is constrained to observe that Dacon's arguments on the interest question are patently flawed—they wholly ignore the fact that a second mortgagee in a 100% financed transaction (the analogy that both parties agree is applicable to the top layer of Fannie Mae's indebtedness) will necessarily demand a much higher interest rate than the rate of return that is reasonably expected by an equity owner on its comparable investment over and above the first mortgage where no second mortgage is present. After all, the equity owner gets all of the benefit if the property appreciates in value (that benefit represents the potential advantage of a highly leveraged transaction, to justify the owner's increased risk-taking on the down side in the leveraged situation), while by contrast the second mortgagee gets nothing more than repayment of its loan if the property value appreciates (so that it bears a high risk with no correlative potential gain on the up side in a correspondingly leveraged deal).

**13.** There is no need to review the subsections not now at issue. For a brief explanation of each, see 8 Theodore Eisenberg, *Debtor–Creditor Law* ("Eisenberg") ¶ 35.08[M][2] (1992 ed.).

*Section 1129(a)(10)*

Section 1129(a)(10) sets forth the minimum requirements for acceptance of a plan:

If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

It thus conditions acceptance on an affirmative vote being cast by at least one class of impaired claims [14] entitled to vote on the plan of reorganization.[15] Section 1126(c), which governs voting by an impaired class on acceptance of a plan, defines "acceptance" in terms of creditors "that hold at least two thirds in amount and more than one-half in number of the allowed claims of such class held by creditors that have accepted or rejected the plan."

Dacon's Plan set up classifications of both secured and unsecured creditors entitled to vote.[16] Fannie Mae was the only secured claimant. But asserting that Dacon's debt to it exceeded the value of its security—that is, the value of Brentwood Apartments—Fannie Mae claimed to be entitled to classification as an unsecured claimant as well.[17] Because Judge Wedoff concluded that Dacon's claim exceeded the value of Brentwood Apartments by almost $1.4 million, he agreed and accordingly allowed Fannie Mae to vote as an unsecured creditor. Those determinations by Judge Wedoff—the size of Fannie Mae's claim and the value of Brentwood—and that right to vote gave Fannie Mae voting control of the unsecured creditor class and allowed it to defeat confirmation (see Sections 1126(c) and 1129(a)(10)).

Dacon's principal argument is that the Bankruptcy Court calculated Fannie Mae's claim improperly by including late charges and default interest (collectively "default charges").[18] It complains that allowing those default charges as components of the claim prevented approval of the Plan. As a fallback argument, Dacon maintains that the Bankruptcy Court erred in its valuation of Brentwood. Neither of those contentions is persuasive.

*Propriety of Allowing Default Charges*

Dacon makes interlocking arguments to support its position that the Bankruptcy Court should not have allowed Fannie Mae's claims for default charges. It contends (1) that the Note provisions calling for late charges and default interest were never triggered and (2) that the default interest and late payment charges operate as impermissible penalties in this case, principally because Fannie Mae received those payments from Green Park until August 1992.[19] Though Dacon's arguments carry some superficial weight at first glance, even a bit more scrutiny demonstrates their specious quality.[20]

---

**14.** "Impairment," a concept unique to Chapter 11, is set forth in Section 1124. As amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Section 1129(a)(10) requires an impaired class of creditors *affirmatively* to accept the plan. As a result, "a class conclusively presumed to have accepted the plan because it is unimpaired and will be paid in full does not suffice to achieve confirmation" (8 Eisenberg ¶ 35.08[M][2], at 35–199 n. 133).

**15.** It is important to distinguish Section 1129(a)(10) from Section 1129(a)(8), which requires that *each* class of impaired creditors vote to accept the plan but which may be overridden by Section 1129(b)(1), which "provides that a 'fair and equitable' plan may be crammed down the throats of objecting creditors" (*Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1359 (7th Cir.1990)). But the cram down provision of Section 1129(b)(1) can apply only if the requirements of Section 1129(a)(10) have already been met.

**16.** Classes II (which consisted of secured claims) and IV (which consisted of unsecured claims) were the only classes entitled to vote.

**17.** Sections 506(a) and 1111(a) allow a creditor to bifurcate its claims.

**18.** Fannie Mae's claim, which the Bankruptcy Court approved, totaled $20,883,811.80. Aside from late charges and interest at the 14% default rate, the claim included unpaid principal, interest at the 10% note rate, accrued and unpaid tax escrow advances, late charges and attorneys' fees (FNMA Ex. 21).

**19.** It was at that point that Green Park and Fannie Mae executed the Settlement Agreement.

**20.** Dacon also points to its entry into the Letter Agreement with Fannie Mae under which the latter promised to forbear from asserting its default rights. But that agreement was express-

Dacon attempts to stress that it is the noteholder's failure to receive payment, rather than Dacon's failure to make that payment, that gives rise to default charges.[21] Because Green Park made payments to Fannie Mae pursuant to the Agreement until August 1992, Dacon argued that default charges were unwarranted. Judge Wedoff rejected that contention (Nov. 6 Tr. 4–5):

> That brings me to the second point raised by the debtor for disallowing default interest or late charges, and that has to do with performance by Green Park of the debtor's obligations. Green Park as the originator and servicer of the loan to the debtor under the delegated underwriting and servicing program of Fannie Mae had obligations to Fannie Mae in the event of a default by the debtor.
>
> These obligations were averted [sic— should be "adverted"] to in Ms. Lierla's testimony and are reflected in the settlement agreement entered into between Fannie Mae and Green Park which has been admitted into evidence as Debtor's Exhibit 16. I find that the payments made by Green Park to Fannie Mae were pursuant to Green Park's obligations to Fannie Mae in connection with the delegated underwriting and servicing program. Certainly there is no evidence of any agreement between Green Park and the debtor under which Green Park would provide financing to the debtor to satisfy the debtor's obligations to Fannie Mae.

Due to both of these, the existence of an independent obligation by Green Park to Fannie Mae to make payments in the event of default by the debtor and the absence of any undertaking by Green Park to pay on behalf of the debtor in connection with any offer of financing to the debtor, I find that Green Park's payments in no way constituted payment on behalf of the debtor so as to cure any default.

As that statement suggests, Dacon's position—its focus on the word "received"— collapses entirely when the position of each of the three actors in the transaction is analyzed. To be sure, as soon as Fannie Mae took over the Note and related documents as Green Park's assignee, it became the "holder hereof" in the sense employed in the Note (see n. 21).[22] But the Note remained a two-party document, with Dacon as the maker—the payor—and with the holder (Fannie Mae) as payee. Green Park's function in servicing the loan was not that of a third party to the Note. Instead it was simply Fannie Mae's agent for collection. Hence a Note payment was either "received" or not "received" depending only on whether *Dacon* as maker did or did not make payment to *Green Park* acting as Fannie Mae's agent.

Green Park's contractual commitment to Fannie Mae established a relationship that

ly conditioned on execution of a formal forbearance agreement, something that never took place. That being so, Letter Agreement ¶¶ 20 and 22 (see n. 8) make it clear that Fannie Mae did not lose any of its default rights. Thus Dacon's argument fails.

**21.** Dacon emphasizes the word "received" in the opening clause of Note ¶ 3:

> If any installment under this Note is not received by the holder hereof within ten calendar days after the installment is due, the undersigned shall pay to the holder hereof a late charge of five percent of such installment, *such late charge to be immediately due and payable without demand by the holder hereof.* If any installment under this Note remains past due for thirty calendar days or more, the outstanding principal balance of this Note shall bear interest during the period in which

the undersigned is in default at a rate of 14.0 percent per annum, or of such increased rate of interest, if any, which may be collected from the undersigned under applicable law. Like the magician's diversionary move to facilitate any sleight of hand trick, that emphasis glosses over the facts (1) that the Note is a promise to pay by *Dacon* (which unquestionably broke that promise on an ongoing basis) and (2) that the higher 14% interest rate applies by its terms if any installment "under this Note" remains due for 30 days and continues so long as "the undersigned [necessarily meaning *Dacon* ] is in default." These factors will be elaborated upon in the text that follows.

**22.** Indeed, that sense is the normal meaning of the term "holder" as used in the Uniform Commercial Code and before that in the law of bills and notes—and even before that in the law merchant.

existed quite apart from the relationship between Dacon as maker of the Note and Fannie Mae as the noteholder. It makes no sense to hinge the determination of duties and rights as between Dacon and Fannie Mae on what happened as between Green Park and Fannie Mae. Imagine for a moment that it had been Green Park rather than Dacon that had suffered financial disaster—that after Dacon had faithfully made installment payments to Green Park as the servicing agent for the loan, Green Park's own problems had led to its not turning over those payments to Fannie Mae. If Fannie Mae had then sought to argue that it had not "received" those payments within the meaning of the Note, so as to precipitate Dacon's obligation to pay default charges, or even worse had sought to argue that those installments had not been "paid" so as to precipitate acceleration of the Note,[23] Dacon would have risen up in righteous indignation—and quite properly so.

Both logic and the normal reading of the documents calls for the concepts of receipt and payment of the Note installments to be viewed only as between Dacon on the one hand and Green Park as though it were the surrogate "noteholder" (by reason of its being Fannie Mae's collecting agent) on the other. Dacon's effort to escape liability based on Green Park's honoring of its separate undertaking to Fannie Mae is wholly without merit.

If Dacon's contention had any force at all, it would surely have to be accompanied by the corollary concept that Dacon's own payment obligation ran to Green Park. But obviously not one to be constrained by considerations of logic or fairness, Dacon has omitted from its Plan any recognition of a separate debt to Green Park due to Dacon's failure to make the Note payments. Its ultimate Plan deleted provisions of its previous plan that would have recognized a claim by Green Park. Under

the uniform Illinois precedents referred to a bit later, which recognize the validity of a future increase in interest rates imposed on a defaulting debtor, Dacon cannot gainsay that the Note's provision for 14% rather than 10% interest kicked in when Dacon's installment payments remained past due for over 30 days. If Dacon did not owe that added interest to Fannie Mae, it follows that it equitably had to owe the added interest amount to Green Park (which Dacon contends was advancing the funds to keep the loan current, and which was plainly bearing the increased risks of Dacon's continued nonpayments).

But under Settlement Agreement § 3.1 Green Park specifically assigned to Fannie Mae all of its claims against Dacon—and that would necessarily include any claims under the Note's various default provisions. So Dacon's argument effectively takes it full circle: Its attempt to extricate itself from liability to Fannie Mae by an unrealistically skewed reading of the Note's language has only succeeded in rendering it liable to Fannie Mae by a more circuitous route.

■ Accordingly, this Court concludes that the default charges were triggered by Dacon's failure to make its payments to Green Park as Fannie Mae's servicing agent. What remains for decision, then, is whether those default charges represent an impermissible (and therefore unenforceable) penalty where (as here) the lender has received equivalent payments from a third party. State law provides the rules of decision in that respect (*In re United Merchants & Mfrs., Inc.*, 674 F.2d 134, 141 (2d Cir.1982)).

■ As suggested a bit earlier, Illinois courts routinely uphold as liquidated damages any contract provisions that require higher interest rates for the future and are triggered by a debtor's current default (see, e.g., *Chemical Bank v. American*

**23.** Here is what the Note provides in that respect:

> If any installment under this Note is not paid when due, the entire principal amount outstanding hereunder and accrued interest

> thereon shall at once become due and payable, at the option of the holder hereof. The holder hereof may exercise this option to accelerate during any default by the undersigned regardless of any prior forbearance.

*Nat'l Bank & Trust Co.,* 180 Ill.App.3d 219, 229, 129 Ill.Dec. 175, 180–82, 535 N.E.2d 940, 945–47 (1st Dist.1989), following *Baker v. Loves Park Sav. & Loan Ass'n,* 61 Ill.2d 119, 128, 333 N.E.2d 1, 6 (1975) and earlier Illinois Supreme Court cases).[24] But the analysis does not necessarily end there. After all, default charges are intended both to create an incentive for prompt payment by the debtor (or stated differently, to deter late payment) and to reflect an enhanced calculation of the creditor's loss of the time value of money, given the presumptively increased risk in light of the default itself. Dacon focuses only on the loss of the use of money—its Mem. 26 urges that the default charges should not be imposed because "[t]he Loss Sharing Agreement between Green Park and FNMA totally protected FNMA from any possible economic harm arising from any default by Dacon under the Dacon Note."

■ That however is not the touchstone of the distinction between permissible liquidated damages (or other permissible charges) and an impermissible penalty, as well described in *Lake River Corp. v. Carborundum Co.,* 769 F.2d 1284, 1289–90 (7th Cir.1985). For that purpose the question is whether the increased price that must be paid by the defaulting debtor is appropriately linked to the fact and nature of the default, and that is certainly true of the default charges specified in the Note.

What Dacon is really complaining about is that Fannie Mae, assertedly not having suffered delay damages because of Dacon's defaults, will receive a windfall by reason of the default charges. But that really would have been a matter to be sorted out as between Fannie Mae and Green Park, if the latter had felt that it should derive any benefit from the enhanced interest and late charges because it had to make good on Dacon's delinquencies. But Green Park extricated itself from the transaction via the Settlement Agreement, assigning all its rights to Fannie Mae. Essentially Dacon has no standing (either legally or equitably) to assert such a claim, which belonged to Green Park alone and now has merged into Fannie Mae's claim against Dacon.[25]

*Valuation of Brentwood*

■ Dacon argues—in half a page wholly devoid of analysis—that this Court should reject Judge Wedoff's evaluation of Brentwood. That contention also fails.

Each side presented expert testimony and appraisals supporting its view of Brentwood's value.[26] Dacon, seeking a low debt-to-value ratio, presented the testimony of John Urubek ("Urubek") placing the value at $20.7 million. Michael Kelly ("Kelly") testified on Fannie Mae's behalf that the property was worth $19.5 million. Each expert employed a number of valua-

---

24. That line of decisions obviously recognizes the increased risks of future noncollection implicit in current defaults. As *Baker,* 61 Ill.2d at 128, 333 N.E.2d at 6 (quoted in *Chemical Bank*) put it:

> The increase in the interest rate is not unreasonable. The additional charge is not for a fixed amount and does not relate back to be computed from a time prior to the breach. Rather it is computed at the stipulated rate only from the date of default and is charged only for the duration of the default. It would appear that actual damages for a breach of any of these covenants would be uncertain and difficult to ascertain or prove. Under these circumstances it would seem appropriate that the parties should agree on an increase in the interest rate as liquidated damages for a breach of a covenant in the mortgage.

25. Even if the real financial impact of Dacon's defaults on Fannie Mae rather than on Green

Park is looked at, Dacon distorts the picture by arguing that Fannie Mae was insulated from economic harm by Green Park's payments of the delinquencies in Note payments. On the contrary, Fannie Mae's original Agreement with Green Park imposed the burden of sharing any losses from the loan on Fannie Mae, and it was compelled to pay nearly $760,000 to Green Park under the Settlement Agreement to extinguish its loss sharing obligations. Dacon's R.Mem. 5 thus puts a false face on matters when it says:

> Any loss realized by FNMA during the four or five months since the settlement with Green Park was caused by FNMA since it chose to settle with Green Park. Absent this settlement, Green Park would have been obligated to continue to make monthly payments under the Loss Sharing Agreement.

26. Each expert was a certified real estate appraiser—an MAI.

tion processes, including the "income" approach to value.

Judge Wedoff examined each appraiser's testimony and concluded that each had done a reasonably competent job. But he was properly troubled by one component of Urubek's income approach. One method regularly employed by appraisers in that respect is the "direct capitalization" or "capitalized earnings" method, under which property value is derived by dividing the stabilized net annual income by the appropriate capitalization rate (see *In re Lettick Typografic, Inc.*, 103 B.R. 32, 37 (Bankr. D.Conn.1989)).[27] Utilizing that method, Urubek found the stabilized net income to be about $1.8 million and applied a capitalization rate of 8.75%. By contrast, Kelly stabilized the net income at just over $2.1 million and applied an 11% capitalization rate.[28]

As Judge Wedoff correctly pointed out, Urubek's computation of the capitalization rate—though purportedly based on actual sales—actually relied on a sale that had fallen through (*id.* at 8):

> There is one critical difference in the two sets of comparables, and that is the one property that is included in both sets of comparables, the Hunters Ridge property, Mr. Urebeck [sic] and Mr. Kelly list difference [sic] sales. Mr. Kelly's sale is at a substantially lower price and at a later date than Mr. Urebeck's [sic]. Mr. Kelly testified that this was because the sale reflected in Mr. Urebeck's [sic] report did not actually go through, and the sale that did actually go through at a later date was for a substantially lower amount.

Both for that reason and because inclusion of the actual sales price also affected the market approach, Judge Wedoff adopted Kelly's rather than Urubek's valuation.

Dacon has provided no reason to overturn that decision—except its belief that its expert was more credible, a point that is obviously belied by the record. Nor does this Court's thorough review of the record disclose any basis for arriving at a decision different from Judge Wedoff's.

### Conversion Order

Dacon hinges its objection to the conversion order on this Court's overturning the Bankruptcy Court's confirmation claim order. Having rejected that appeal, this Court sees no reason to disturb the wholly proper conversion order (see Section 1112(b)).

### Conclusion

Dacon's Third Amended Plan of Reorganization failed to gain the approval of either class of creditors entitled to vote. As a result, Section 1129(a)(10) required the Bankruptcy Court to deny confirmation. Judge Wedoff's orders doing so and converting Dacon's Chapter 11 reorganization into a Chapter 7 reorganization are affirmed.

---

**27.** Another more complex methodology that is sometimes used (usually in conjunction with straight income capitalization) is that of calculating the discounted cash flow from the property (see *In re Southmark Storage Assoc. Ltd.*, 130 B.R. 9, 10–11 (Bankr.D.Conn.1991)). Urubek made such a supplemental calculation as well, while Kelly did not.

**28.** As Judge Wedoff explained, those differences—though obviously significant—are not as large as they seem at first blush (Nov. 6 Tr. 7):

> [T]here may not be as great a difference as appears on the surface. The reason for that is as the stabilized net income increases the capitalization rate would be expected to increase also, in that the greater the difference between current annual income and the expected annual income stabilized ... the greater the capitalization rate would be expected to be because the greater risk involved in purchasing the property would be.