**In re 203 NORTH LaSALLE STREET LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 95 B 4998.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Dec. 5, 1995.

---

Thomas S. Kiriakos, Beverly J. Klein, Craig E. Reimer, Mayer, Brown & Platt, Chicago, Illinois, for Bank.

Richard M. Bendix, Jr., Richard T. Reimbman, Paul J. Gaynor, Schwartz, Cooper, Greenberger & Krauss Chartered, Chicago, Illinois, for debtor.

## MEMORANDUM OF DECISION

EUGENE R. WEDOFF, Bankruptcy Judge.

This single asset Chapter 11 case is before the court for determination of whether the debtor's Second Amended Plan of Reorganization, dated September 11, 1995 (the "September 11 plan"), should be confirmed. Based on the facts adduced at the hearings on this matter, and for the reasons set forth below, the court finds that the plan generally satisfies the requirements of 11 U.S.C. § 1129 and that confirmation is appropriate, subject to a minor modification.

### Jurisdiction

The confirmation of a plan of reorganization, as a proceeding that arises under the Bankruptcy Code (Title 11, U.S.C.), is within the jurisdiction of the district court pursuant to 28 U.S.C. § 1334(b). The district court may refer such proceedings to bankruptcy judges pursuant to 28 U.S.C. 157(a), and by General Rule 2.33, the District Court for the Northern District of Illinois has done so. The confirmation of a plan, pursuant to 28 U.S.C. § 157(b)(2)(L), is a core matter as to which a bankruptcy judge may enter appropriate orders and judgments.

### Findings of Fact

*Background.* The debtor is an Illinois limited partnership that owns fifteen floors of office space in a building in the central business district of Chicago. These floors are the upper portion of a larger building, whose lower portion is devoted to retail stores and parking. The lower portion is separately owned, with the two owners jointly responsible for maintenance. The debtor's property is encumbered by a lien in favor of Bank of America Illinois (the bank). This lien secures a nonrecourse note in the principal amount of $92,582,000. The note became due and payable, according to its terms, on January 3, 1995. The debtor was unable to pay the note at that time, and the bank commenced a state court foreclosure action on January 20. In response, the debtor filed this bankruptcy case on March 13. At the time of the filing, the bank's claim, principal and interest, was $93,013,612. Also outstanding at the time of the filing were several other, smaller claims: (a) a state property tax claim of about $2.3 million, (b) general unsecured trade debt of about $160,000, (c) unsecured insider claims of $7.7 million (of which $6.8 million is a claim of the debtor's general partner for an unsecured loan), and (d) a second mortgage held by the debtor's general partner in the amount of $11.3 million. After the filing, the debtor's general partner purchased some of the trade claims, reducing the general unsecured claims held by noninsiders to about $90,000. In addition to its real property, the debtor holds the right to a cash account, consisting of prepetition rents, that at the time of confirmation held approximately $3.1 million.

Because of the relatively straightforward financial issues of this case, and in order to avoid motions raising the question of whether an effective reorganization was possible, the court ordered the debtor to propose its plan of reorganization within 30 days of the case filing. Accordingly, on April 13, the debtor proposed its original plan of reorganization, subsequently amended on May 12. To expedite the proceedings further, the court conditionally approved a disclosure statement for the May 12 plan, and, with the consent of the parties, considered the adequacy of the statement, together with plan confirmation, at a single hearing. See A. Thomas Small, "Small Business Chapter 11 and Chapter 11A Cases," Education Program Materials, 67th Annual Meeting of the National Conference of Bankruptcy Judges, Orlando, Florida, Oct. 17–20, 1993, p. 1–23, for a description of this procedure. The court held a hearing and received briefs from the parties in June, and, on August 7, denied confirmation of the plan. The principal ground for the ruling was unfeasibility: the minimum interest rate that the court found to be required for payment of the bank's secured claim could not be supported by the projected cash flow of the property. However, because the question of the appropriate interest rate was an unsettled legal issue, the court allowed the debtor an opportunity to amend its plan.

After a number of revisions, the debtor ultimately proposed the pending plan, dated September 11, and the court again conditionally approved a disclosure statement for the

plan. On October 20, following notice and an opportunity for creditors to change their votes, the court conducted a second combined hearing on adequacy of disclosure and confirmation. At this hearing, there was no objection to the adequacy of the disclosure statement, and it was agreed that evidence taken in the first confirmation hearing would be considered in connection with the September 11 plan.

■ *Property valuation.* The principal factual dispute between the parties concerns the value of the property, and the closely related question of the cash flow the property is likely to generate. Both the debtor and the bank presented expert appraisal testimony on these issues, and the experts agreed on the most appropriate valuation method: discounted cash flow. This technique—described in Leslie K. Beckhart, *No Intrinsic Value: The Failure of Traditional Real Estate Investment Methods to Value Income–Producing Property,* 66 S.Cal.L.Rev. 2251, 2285–2288 (1993)—operates basically in three steps. First, the appraiser estimates the cash flow that the property will generate each year of a several year holding period. Next, the appraiser determines the "reversionary" value of the property, at the end of the period, by capitalizing a stabilized income that the property is estimated to then produce. Finally, using an appropriate discount rate, the appraiser reduces the values derived in the first two steps to present values, and totals these values to arrive at the value of the property. See American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 487–518 (9th ed. 1987), for a fuller discussion of this method of valuation.

The court accepts the discounted cash flow method of valuation. The Beckhart article persuasively argues for its superiority over alternative methods, and the agreement of opposing experts gives a further indication of its appropriateness. To arrive at a valuation of the property, then, it is necessary (1) to estimate net cash flows over an appropriate holding period, and (2) to determine both an appropriate capitalization rate for the reversion and an appropriate discount rate.

In the pending case, each of the appraisers chose a period of ten years for estimating annual cash flow, and then capitalized a stabilized income for the eleventh year. The appraisers differed, however, in their estimates of income and in the capitalization and discount rates they applied. The debtor's appraiser applied a higher discount rate (14.367%) to overall higher income estimates; the bank's appraiser used both a lower discount rate (11.75%) and lower income estimates.[1] The following table summarizes the differences in their determinations for the ten year holding period, with the debtor's valuation about $1.1 million higher than the bank's.

| Year Ending | Debtor's Estimated Cash Flow (in $ thousands) | Present Value (discounted at 14.367%) | Bank's Estimated Cash Flow (in $ thousands) | Present Value (discounted at 11.75%) |
|---|---|---|---|---|
| 1996 | 4,085 | 3,572 | 4,334 | 3,878 |
| 1997 | 5,720 | 4,373 | 5,769 | 4,620 |
| 1998 | 5,768 | 3,856 | 2,904 | 2,081 |
| 1999 | 5,683 | 3,322 | 5,587 | 3,583 |
| 2000 | 6,933 | 3,543 | 7,195 | 4,129 |
| 2001 | 7,388 | 3,302 | 7,751 | 3,980 |
| 2002 | 1,938 | 757 | 3,438 | 1,580 |
| 2003 | 4,350 | 1,486 | (3,446) | (1,417) |
| 2004 | 7,238 | 2,162 | 6,081 | 2,237 |
| 2005 | 8,637 | 2,256 | 8,464 | 2,787 |
| Total | 58,285 | 28,628 | 48,077 | 27,457 |

1. The debtor's appraiser used a 13.5% discount rate, compounded monthly, for purposes of discounting the annual cash flows. This rate is equivalent to an APR of 14.367%, which is used here to make the comparisons consistent (all other discount figures use annual compounding).

The appraisers similarly differed in their calculation of the reversionary value, as shown below, but here the debtor's valuation was about $4.8 million less than the bank's:

|  | Debtor | Bank |
|---|---|---|
| Estimated Stabilized Income (in $ thousands) | 9,143 | 8,340 |
| Capitalization Rate | .10 | .09 |
| Gross Reversionary Value | 91,425 | 92,667 |
| Estimated Disposition Cost | 2,286 (2.5%) | 1,853 (2%) |
| Net Reversionary Value | 89,140 | 90,814 |
| Discount Rate | .135 | .1175 |
| Present Value | 25,125 | 29,900 |

The result of these differing approaches was an estimated value of $53,750,000 by the debtor and $57,400,000 by the bank.

■ The court cannot accept either of these valuations. The future cash flows of the property depend primarily on the renewal of leases. The property is, at present, nearly fully leased, but two leases to major tenants will expire during the ten-year holding period. The debtor negotiated a renewal of one of these leases contingent on confirmation of its plan, and that renewal is reflected in the appraisers' estimates of future cash flow. The other major tenant, however, has not agreed to a lease renewal. If it fails to renew, the debtor may experience (1) a period of vacancy in a significant portion of its space, (2) increased commissions on rerental, and (3) increased costs of space alteration. The bank's appraiser treated this tenant's lease, for most purposes, in the same way as other, smaller tenants, estimating a 50% chance of renewal. The debtor's appraisal, on the other hand, assumed a 100% chance of renewal of the lease, and assumed highly favorable circumstances in that renewal. This is the primary basis for the difference in estimated cash flows. The court's assessment of the situation generally lies between those of the appraisers. Given the size of the space occupied by the tenant, and the paucity of available alternative space, it is very likely that the tenant will renew its lease. However, the importance of the tenant to the debtor's operations will likely allow it concessions that will depress the debtor's cash flows under the renewed lease. Thus, the most reasonable estimation of income reflects no extraordinary loss at the time of the lease expiration, but lower income than

suggested by either appraiser in the period after the renewal of the lease.

■ The difference between the two appraisers on capitalization and discount rates reflects their different approaches to income estimation. The debtor's appraiser took the point of view that because the cash flow projections were somewhat risky, the capitalization and discount rate should be at the high end of the spectrum of reasonable rates. The bank's appraiser took the point of view, in light of the high quality of the building (and perhaps the conservative estimation of cash flows), that the rates should be at the lower end of the spectrum. The court's view is that, when the income is properly estimated to take into consideration the most likely leasing results, the rates employed should be those of an average building of the debtor's type: in this case, a first class office building in the central business district. From the data presented by the appraisers, these average rates would be a 10% terminal capitalization rate and a 12% discount rate.

Applying the 12% discount rate to future cash flows, as found by the court, results in a present value, over the ten-year holding period, of $30.0 million, as shown below:

| Year Ending | Estimated Cash Flow (in $ thousands) | Present Value (discounted at 12%) |
|---|---|---|
| 1996 | 4,100 | 3,661 |
| 1997 | 5,700 | 4,545 |
| 1998 | 5,300 | 3,772 |
| 1999 | 5,700 | 3,621 |
| 2000 | 6,900 | 3,916 |
| 2001 | 7,300 | 3,698 |
| 2002 | 1,000 | 452 |
| 2003 | 3,800 | 1,538 |
| 2004 | 6,500 | 2,344 |
| 2005 | 7,700 | 2,479 |
| Total | 54,000 | 30,026 |

The present value of the reversion, based on stabilized income in the eleventh year of $8.2 million, capitalized at 10%, and discounted at 12%, is $25.8 million, calculated as shown below:

| | |
|---|---|
| Estimated Stabilized Income (in $ thousands) | 8,200 |
| Capitalization Rate | .10 |
| Gross Reversionary Value | 82,000 |
| Estimated Disposition Cost | 1,845 (2.25%) |
| Net Reversionary Value | 80,155 |
| Discount Rate | .12 |
| Present Value | 25,806 |

The total value of the property, then, as of the time of the confirmation hearing, was $55.8 million.

*The debtor's plan.* The major features of the debtor's September 11 plan, relevant to the present decision, are the following:

(1) The debtor's partners would contribute a total of $6.125 million in new capital to the debtor over the life of the plan, $3 million on the day after the effective date of the plan, and $625,000 on each of the next five anniversaries of the effective date. The payment of the five annual installments would be secured by a continuing letter of credit in the amount of $1,250,000.

(2) Priority and tax claims would be paid in full, within 30 days of the effective date of the plan, from funds currently on deposit.

(3) The trade creditors would be paid in full, without interest, 180 days after the effective date of the plan. Upon confirmation, the insiders would waive the general unsecured claims that they hold (including, apparently, the claims purchased by the general partner).

(4) The bank's secured claim, fixed at $54,544,500, would be paid partly in cash ($1,149,500 within five days of the effective date of the plan), and partly through an interest bearing note, secured by the bank's lien on the property. Monthly payments would be made on the note, on a thirty-year amortization schedule, and the note would mature in seven years, extendable to ten years at the debtor's option, upon certain conditions. The principal of the note would further be reduced by monthly payments to the bank of the excess cash flow of the property. The note would compensate the bank for its extension of credit in three ways; first, a commitment fee in an amount between $266,975 and $545,000, to be determined by the court; second, fixed "base interest" at a rate 3½ per cent over the rate of U.S. Treasury obligations maturing 7 years after the effective date of the plan; and third, "participation interest" of 50% of the net value of the property, either as realized in a sale, or as appraised at the time of any refinancing.

(5) From the remaining value of the property at the time of sale or refinance, payments would be made in the following order: (a) on the unsecured deficiency claim of the bank, payment in full, without interest; (b) for the new capital contributions, payment in full, with interest at varying rates; (c) on the second mortgage held by the general partner, full payment with 10% simple interest; and (d) to the debtor's partners in proportion to their contributions of new capital.

(6) In the event of any default in making the new capital contributions or in making payments under the note, a deed to the debtor's property, held in escrow by a title company, is to be conveyed to the bank. The plan also has a number of features designed to minimize the possibility of any future bankruptcy filing interfering with the bank's right to obtain this conveyance.

This plan, and indeed, the entire bankruptcy case, was filed by the debtor primarily to avoid the severe tax consequences to the debtor's partners of a foreclosure sale of the debtor's property. The principal of the general partner estimated the collective tax liability of the partners, in the event of foreclosure, at $20 million.

The general unsecured creditors in the class defined by the debtor's plan voted in favor of the plan; the only votes against confirmation were those of claims held or purchased by the bank.

### Conclusions of Law

In order for a plan to be confirmed in a Chapter 11 case, the proponent of the plan must demonstrate that the requirements of Section 1129 of the Bankruptcy Code are satisfied. Although the matter has been debated, it now appears fairly well established that the burden of proof is by a preponderance of the evidence. *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1163–65 (5th Cir. 1993); *In re Arnold & Baker Farms*, 177 B.R. 648, 654–55 (9th Cir. BAP 1994); *In re Locke Mill Partners*, 178 B.R. 697, 700 (Bankr.M.D.N.C.1995). That standard has been applied to the fact findings set forth above, and in the discussion that follows. However, even if a plan proponent were required to establish compliance with Section 1129 by clear and convincing evidence, the court's determinations would be the same.

Section 1129 operates in two parts. First, Section 1129(a) sets forth a number of requirements generally applicable to Chapter 11 plans. These include, in Section 1129(a)(8), a requirement that the plan be accepted by each impaired class of claims or interests. Second, Section 1129(b) provides that a plan complying with all of the other requirements of Section 1129(a) may be confirmed despite the failure of an impaired class to accept it, if several additional "cram down" requirements are also met. *In re Bryson Properties, XVIII*, 961 F.2d 496, 500 (4th Cir.1992); *Hanson v. First Bank*, 828 F.2d 1310, 1312 n. 2 (8th Cir.1987). Because the bank has not accepted the debtor's plan, both the general and cram down requirements are applicable here. The bank contends that the plan fails to meet nine of these requirements.

In considering the bank's objections, it is helpful to group them into three general categories: treatment of the secured claim, treatment of unsecured claims, and general requirements for confirmation.

### A. Treatment of the bank's secured claim.

#### Objection 1: Section 1129(b)(2)(A).

■ The cram down provisions of Section 1129(b)(1) include the requirement that a plan be "fair and equitable" with respect to each nonaccepting impaired class. Section 1129(b)(2) fleshes out this requirement by defining minimum standards of fairness and equity in the treatment of the various classes of claims and interests. The minimum standards for secured claims are set out in Section 1129(b)(2)(A). Under this provision, a plan may provide for the creditor to retain the liens on its collateral and for creditor to "receive on account of [its secured] claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in [the collateral]." Under this option, the creditor must be paid the amount of its allowed secured claim together with a market rate of interest. *In re Bryson Properties, XVIII*, 961 F.2d 496, 500–01 (4th Cir.1992) (market rate of interest provides

creditor with present value of its claim); *cf. In re James Wilson Assocs.*, 965 F.2d 160, 172 (7th Cir.1992) (indubitable equivalent of claim is provided by an interest rate that "compensates [the secured creditor] for the opportunity cost of its money and the risk of default"). The bank contends that the September 11 plan fails to meet this requirement in two respects: first, that it undervalues the bank's claim; second, that the interest rate is below market.

■ *Disposition costs.* With respect to the amount of the secured claim, the parties agree that because the collateral supporting the bank's claim is worth less than the bank's total claim ($93,013,612), and because the bank did not make the election under Section 1111(b) of the Code to have its total claim treated as secured, there must be a bifurcation of that claim under Section 506(a). This bifurcation results in the bank having a secured claim to the extent of the value of its interest in the collateral, and an unsecured claim for the difference between the value of its interest in the collateral and its total claim. The parties further agree that, for purposes of this bifurcation, the collateral should be valued as of the time of confirmation. See *In re Addison Properties Ltd. Partnership*, 185 B.R. 766, 770–75 (Bankr. N.D.Ill.1995), for a discussion of the process and timing of Section 506(a) bifurcation. As set out above, the court has valued the debtor's property serving as collateral for the bank's claim at $55,800,000. The disagreement between the parties—beyond the factual issue of the valuation—is over the question of whether the bank's interest in the property should be reduced by the costs that the bank would incur in converting that interest to cash. The debtor's plan estimates the bank's disposition costs at 2¼% of the property value ($1,255,500), and so sets the amount of the secured claim at $54,544,500. The bank raised no objection to the amount of the estimated costs, and the court finds them reasonable. However, the bank argues that it is improper as matter of law for any disposition costs to be used in valuing its interest in the debtor's property, citing, among other decisions, *In re Winthrop Old Farm Nurseries, Inc.*, 50 F.3d 72, 74 (1st Cir.1995); *In re*

*Trimble,* 50 F.3d 530, 532 (8th Cir.1995); and *In re Rash,* 31 F.3d 325, 329 (5th Cir.1994), *modified,* 62 F.3d 685, *reh'g en banc granted,* 68 F.3d 113 (1995).

The decisions cited by the bank primarily deal with the question of whether, for purposes of bifurcation under Section 506(a), the value of collateral should be viewed from the perspective of the debtor or the creditor. The relevant statutory language is the following:

> ■ An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. [2] Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property....

Initially, courts construed this language by placing primary emphasis on the first sentence of Section 506(a), which defines the secured claim as the value of the "creditor's interest" in the estate's interest in property. Because the creditor would ordinarily be able to obtain the value of its interest only in a wholesale transaction or foreclosure sale, the courts generally sought to determine what value that the creditor would obtain in such a sale. The disposition costs involved in such a sale, accordingly, were deducted. *See In re Balbus,* 933 F.2d 246, 252–53 (4th Cir.1991) (Murnaghan, J., dissenting) (collecting authorities). Latter decisions, including those cited by the bank, focused more on the second sentence of Section 506(a), which requires that the value of the secured claim be determined in light of "the proposed disposition or use" of the collateral. This language suggested to these courts that valuation should depend on what the debtor plans to do with the property, and that, unless the debtor plans a liquidation, the property should be valued at its retail or replacement cost. Under this view, the creditor's likely disposition costs are irrelevant to the determination. *See In re Rash,* 62 F.3d at 685–87 (collecting authorities).

■ However, despite its adoption by a number of circuits, this "second sentence" view of Section 506(a) is not the best reading of the section. In order to give effect to all of the statutory language, the value of the secured claim should be measured—as first sentence of Section 506(a) requires—by the value of the "creditor's interest" in the estate's property, and unless the creditor has some special capacity for dealing with that property, its interest is the value that it can obtain from a sale of the property. Indeed, the Code gives the debtor the alternative of treating secured claims in cram down by selling the property and giving the creditor a claim to the net proceeds. 11 U.S.C. §§ 1129(b)(2)(A)(ii), 506(c). Next—as the second sentence of Section 506(a) states—the disposition and use of the property must be seen as having a potential influence on the value of the creditor's interest. Thus, if a debtor intends to hold damaged equipment for ultimate sale as scrap, the creditor cannot assert that it should be valued as though it were repaired and used in a going concern. And similarly, if the property is intended to be used in an ongoing business, the debtor cannot insist on a forced-sale valuation. In this way, the intended disposition or use of the property is relevant, but, as Judge Robert Parker pointed out in his dissent from denial of panel rehearing in *Rash,* now pending rehearing en banc, intended disposition or use is relevant only "to the extent that it affects the creditor's interest in the collateral." 62 F.3d at 688.

Here, the creditor is a bank, and there is no indication that, in the absence of a bankruptcy, the bank would operate the property as owner. Its interest, as creditor, is in reducing its claim against the property to cash. Taking into consideration the use of the property intended by the debtor, there is no reason to suppose that the bank would not be able to sell the property for its fair market value, and so the bank is entitled to this value, rather than a lower value based on a foreclosure or other forced sale. However, in order to realize fair market value, the bank would have to incur disposition costs, and those costs are properly deducted in determining the value of the bank's interest

in the property and, hence, the amount of its secured claim under Section 506(a). *Cf. In re Schaumburg Hotel Owner Ltd. Partnership*, 97 B.R. 943, 948–49 (Bankr.N.D.Ill. 1989), and *In re Davis*, 14 B.R. 226, 228 (Bankr.D.Me.1981) (each valuing a claim secured by property retained by the debtor at fair market price less disposition costs).[2] The valuation of the bank's secured claim at $54,544,500 is therefore correct.

■ *Interest.* With the amount of the bank's secured claim fixed, the remaining issue under Section 1129(b)(2)(A) is the market rate of interest that properly compensates the bank for not receiving a cash payment of this claim on the effective date of the plan. In assessing this rate, a key role is played by the discount rate used to establish the fair market value of the property.

*a. The minimum interest for a nonrecourse loan with a 100% loan to value ratio is the discount rate.* As the bank's expert persuasively testified, it is economically impossible for a lender to make a nonrecourse loan secured only by real property that is worth no more than the amount of the loan (*i.e.*, a nonrecourse loan with a 100% loan to value ratio). The reason for this is clear from a comparison of the discount rate with an appropriate interest rate.

■ The discount rate, as described above, determines the price that an owner is willing to pay to receive the expected future cash flows of a particular investment. The owner discounts the future returns on the investment by a rate that reflects two different costs: (1) the cost of not consuming its cash immediately, together with the cost of infla-

tion—what the *James Wilson* decision refers to as "the opportunity cost of its money," and (2) a risk premium, reflecting the uncertainty that the expected returns will actually be realized. Beckhart, *No Intrinsic Value, supra*, 66 So.Cal.L.Rev. at 2286; *cf.* Frank K. Reilly, *Investment Analysis and Portfolio Management* 17–25 (4th ed. 1994) (discussing components of rate of return). The lender's interest rate similarly compensates the lender for its "opportunity cost" and risk premium. "Opportunity costs" are the same for both an owner and a lender. Reilly, *supra*, at 21 (costs related to deferred use of money and inflation affect all investments equally). So if the risk premium for a particular investment is also same for both owner and lender, the owner's discount rate and the lender's interest rate would be identical.

This situation can easily be imagined: consider a nonrecourse loan made to finance the purchase of Treasury bills, with the bills themselves the only security for the loan, and the term of the loan equal to the bills' term to maturity. Since T-bills are assumed to be risk free, Reilly, *supra*, at 19, the risk premium for the owner of the bills and for the lender is identical—zero for each. Ignoring the transaction costs of processing and enforcing the loan, the only costs to the owner and the lender in such a transaction would be the identical "opportunity cost," and so the discount rate that the buyer would use in determining what to pay for the bills would be the same as the interest rate that the lender would demand on a loan for the purchase price. With the interest rate equal to the discount rate, the owner would pay in interest all of the anticipated earnings on the

---

2. *Winthrop Old Farm Nurseries* expresses the fear that this interpretation of Section 506(a) will lead to inequitable results: "allow[ing] a reorganizing debtor to reap a windfall by stripping down the lien to liquidation value and quickly selling the collateral at fair market value, thus pocketing equity that would have been completely beyond reach save for the filing of the bankruptcy petition." 50 F.3d at 76. This fear is misplaced for two reasons. First, the property should be valued using whatever method of sale, commercially available to the creditor, produces the highest value. In many cases, like the present one, this will be the fair market value. A debtor, no less than its secured creditor, would incur disposition costs to obtain this value, and so there is no

"quick profit" available to the debtor. Second, to the extent that the debtor is able to sell the property for more than the value of the secured claim, the resulting profit may well be directed—as in the present case—to the payment of unsecured claims, including the secured creditor's deficiency claim, rather than to the pockets of the debtor.

Other decisions, *e.g.*, *In re McClurkin*, 31 F.3d 401, 405 (6th Cir.1994), use the phrase "purely hypothetical" in determining that disposition costs should not be deducted from the value of a secured creditor's claim. Yet the entire process of claim valuation is "purely hypothetical," since it ascribes value to property without an actual sale.

bond, and this is entirely reasonable: the owner, having put nothing at risk, would hardly be accorded any earnings; the lender, having risked the entire sum necessary to purchase the bonds, would expect all of the earnings.

If the situation is changed to one in which the risk to the lender is greater than the risk to the owner, then the interest rate must be higher than the discount rate. This is precisely the situation in regard to a nonrecourse loan for the entire value of real estate, secured only by the real estate. Even if transaction costs are again ignored, the lender has greater risk, since its return is limited to the interest specified in its agreement with the owner, while the owner has the benefit of any greater than anticipated cash flows. *Cf. Dacon Bolingbrook Assocs. v. Fed. Nat'l Mortgage Ass'n*, 155 B.R. 467, 470 n. 12 (N.D.Ill.1993) (noting that second mortgage holder has greater risk than owner of equity). Accordingly, a market-based, nonrecourse loan for the entire value of real property is the economic equivalent of a flying pig: it does not and cannot exist. To compensate the lender properly for the increased risk it bears, the interest rate on such a loan would have to be higher than the discount rate used by the owner in valuing the property, and this would require a return to the lender of more than the anticipated cash flow of the property. In this way, financial theory corroborates common sense: even more than in the situation of T-bills, an owner who invests no money in the purchase of real property, and assumes no liability, will not, in the market, receive any return on its "investment."

This situation would not change simply because two lenders were involved instead of one. The debtor's expert testified, without contradiction, that a commercial lender would be willing to make a ten-year nonrecourse first mortgage loan of 70% of the value of the debtor's property with a risk premium rate of 2% over the rate of Treasury issues with a comparable maturity (then about 6%), for a total interest rate of 8%. It is reasonable that such a loan would bear an interest rate less than the discount rate, because the risk that the lender will not receive

its expected earnings is substantially reduced by the 30% equity cushion. However, any second-mortgage lender in such a situation would require a rate of interest on a loan of the remaining 30% of the property value much greater than the discount rate, and the blended interest rate on the two loans would exceed the discount rate.

For an illustration of this process, consider the situation suggested by the debtor's expert: a nonrecourse first mortgage loan of 70% of the value of real property, at 8% interest, where the property is valued using a 12% discount rate. For purposes of illustration, assume that the property is worth $1000; the loan would then be $700, and the owner's investment would be $300. If the property performs as expected, 12% of its value annually (on average), or $120 will be generated in net cash flow. Of this cash flow, 8% of the $700 loan—$56—would annually be expended in interest on the loan. The owner would then receive the remaining cash flow—$64—as a return on its investment of $300. That is an annual return to the owner of 21.3% ($64/300). The owner receives this return, higher than the discount rate, because its risk is leveraged: the first mortgage lender receives nearly half of the income of the property before the owner receives anything. A second lender who took the debtor's position in this situation would similarly have leveraged risk, but its risk would again be greater than the owner's, because of its inability to obtain greater than anticipated cash flows. Thus, the lender would require, for a market rate of interest, more than the owner's leveraged anticipated rate of return, or, in this illustration, more than 21.3%.

There are decisions that attempt to arrive at a hypothetical market rate for cram down of the undersecured portion of a secured claim by similarly splitting the claim into two separate portions: a 70–75% portion that can be financed at a commercial rate, and a 25–30% portion that is financed at a hypothetical "second-mortgage" or "equity" lending rate. The rates attributable to the two loans are then blended. See the "band of investment" technique employed in *In re Bloomingdale Partners*, 155 B.R. 961, 984–85 (Bankr.

N.D.Ill.1993), and *In re SM 104 Ltd.*, 160 B.R. 202, 233–34 (Bankr.S.D.Fla.1993). If the second-mortgage loan in the band of investment technique is accorded a properly leveraged interest rate, this technique will similarly result in the conclusion that a nonrecourse loan for 100% of the value of real property is not possible, because the blended interest rate will be greater than the discount rate.

It was largely on this basis that the court denied confirmation of the debtor's initial plan. The proposed interest rate was below the discount rate, and payment of interest at greater than the discount rate would be impossible, requiring expenditure of more than all of the property's anticipated cash flow.

■ *b. The debtor's present plan provides for payment of a market rate of interest.* From the foregoing discussion of discount and interest rate, it is apparent that, for cram down of an undersecured claim in a single asset real estate case, the secured creditor must be given something of value to reduce the risk that it faces in extending financing of 100% of the value of its secured claim, without recourse. The debtor's September 11 plan, now before the court, reduces the risk to the secured creditor of payment on its secured claim in several respects, as compared to simple nonrecourse financing of the entire property value.

● The debtor would use newly contributed funds, now on deposit, to make an immediate cash payment of $1,149,500 on the secured claim. Thus, the proposed new note to the bank would be in the principal amount of $53,395,000, about 98% of the value of the bank's interest in the property.

● The debtor proposes to use additional funds now on deposit ($1,850,500), and five future annual contributions of $625,000 to add to the debtor's operating funds. The first two of these payments (totalling $1,250,000) are secured by a letter of credit; discounting these two payments at 8% (considering the reduced risk involved with the letter of credit) produces a present value of $1,114,500. These additional funds reduce the risk to the bank that any shortage in anticipated cash flows will result in the debtor's inability to repay the loan. Moreover,

the notes documenting the partners' obligation to make their annual contributions are collateral for the new note to the bank. If the present value of all of the money to be contributed by the partners, either now on deposit or secured by the letter of credit, $4,114,500, is counted as "value" to the bank, the loan to value ratio for the proposed new note drops to about 93%.

● Although the new bank note is nonrecourse, the partners are liable to the extent of their promissory notes for annual contributions, and apart from these notes, there is "de facto" recourse. As noted above, the partners will suffer a collective $20 million dollar tax liability if the debtor's property is sold in a foreclosure sale. They have a substantial incentive, therefore, to make their additional contributions to the partnership to assure that the partnership meets its obligations under the new note to the bank. Moreover, the letter of credit securing payment of the partners' contributions is not fully released until all five of the $625,000 annual payments are made. These factors combine to give some assurance that even the three payments not initially secured by the letter of credit will be made. It is difficult to value these last contributions for collateral purposes, since payment would depend on the future financial situation of the individual partners, a question not fully explored at the hearing. However, even if the last three payments are discounted at 18%, indicating a quite high risk of nonpayment, they would still provide present value of about $976,000, reducing the loan to value ratio for the proposed new note to about 91%.

The compensation offered to the bank under the proposed new note is not a flat interest rate. Rather, as described above, it consists of three separate elements: a loan origination fee of between $266,975 and $545,000, fixed base interest (at 3.5% over the rate earned by Treasury obligations maturing 7 years from the effective date of the plan), and a 50% participation in the net proceeds of any sale or refinancing. Using the cash flow projections set forth in the findings of fact, assuming that the debtor's partners make all of the contributions provid-

ed for by the plan, and fixing the origination fee at $266,975, these provisions would allow the bank a total ("all-in") rate of return of about 12% on its secured claim. The debtor can propose this compensation to the bank, at a rate that approximates the discount rate used to value the property, for two reasons: first, there is the contribution of new capital, which allows the amount financed to be less than the value of the property; second, a portion of the compensation is not paid until sale or refinance, and it is based on an anticipated appreciation of the property. Whether this is a market rate of return (*i.e.*, a rate that adequately compensates the bank for its "opportunity cost" and the risk of nonpayment), depends on how, in the market, a lender would view the entire transaction proposed by the debtor.

The debtor presented convincing evidence that the transaction is acceptable in the market. Robert Walter, a regional vice president of General Electric Capital Corporation ("GE Capital"), prepared a letter of intent, outlining the terms on which GE Capital would consider financing the debtor's property. In all but one respect, discussed below, the terms of the letter of intent are the same, or more favorable to the debtor, than the terms of the new note proposed by the September 11 plan. The most significant difference between the letter of intent and the proposed new note is that the letter of intent, unlike the note, reduces the net proceeds subject to lender participation by the amount of new capital contributed, and allows the partners a 9% equity return on their new capital before net cash flows are paid to reduce the loan principal. As a result of these differences, among others, the all-in rate of return under the letter of intent is significantly less than under the plan: 10.64% as calculated by the bank's expert; 11.28%, as calculated by the debtor.[3]

The debtor did not pursue a commitment from GE Capital because the bank indicated that it would not agree to a cash payment of its secured claim in the amount found by the court, and the bank would have had the option of having its entire claim treated as secured if the debtor proposed such a cash out, pursuant to Section 1111(b) of the Code. However, Walter testified credibly that he had studied the financial data relevant to the debtor's property, that his letter of intent reflected terms that were consistent with the terms under which GE Capital made loans on central business district office buildings, and that the all-in rate of return under the terms of the letter of intent would adequately compensate GE Capital. Furthermore, he identified a number of other lenders who he believed would be interested in financing the debtor on similar terms.

The bank attempted to discredit Walter's testimony by characterizing GE Capital as an insignificant market participant. However, as a lender to single asset real estate projects in an annual amount of approximately $2 billion, GE Capital is significant, and has expertise bearing precisely on the issues relevant to a market rate of return on the note proposed by the September 11 plan. As further grounds for disregarding Walter's testimony, the bank's expert referred to a number of funds investing in distressed mortgages, which required returns in the range of 15–25%. Yet it is plain from the analysis set out above that these rates of return must be on properties whose cash flow is subject to much greater risk than those of the debtor's property—*i.e.*, properties valued with discount rates much greater than the 12% applicable here. A property generating cash flow at an average of 12% simply cannot support financing at rates of 15–25%.

Accepting the testimony of Robert Walter, the court finds that the compensation to the bank proposed by the September 11 plan provides a market rate of return on the bank's secured claim, and that the treatment of the claim satisfies the requirements of Section 1129(b)(2)(A).[4]

3. The Debtor's Supplemental Post–Trial Memorandum, filed November 3, 1995, points out (at 8–10) errors in the bank's expert's calculations that account for the difference in the calculations.

4. The one respect in which the debtor's plan is more favorable to the debtor than are the terms of the letter of intent is in the commitment fee. The letter of intent calls for a flat 1% fee of the loan amount, *i.e.*, $533,950. The debtor's plan

### B. Treatment of the bank's unsecured claims.

In addition to its secured claim, discussed above, the bank has unsecured claims in two classes defined by the September 11 plan. First, the bank has an unsecured deficiency claim of $38,469,112, the difference between its total mortgage claim, and the value of its interest in the debtor's property, pursuant to Section 506(a) of the Code. Second, the bank has purchased general trade claims worth about $5,000, and voted these claims against the debtor's plan. The bank has asserted objections to confirmation based on the proposed treatment of both of these classes of unsecured claims.

### Objection 2: Section 1129(a)(7)(A)— the best interests test.

Section 1129(a)(7)(A) of the Code enunciates what was, under the former Bankruptcy Act, the "best interests of creditors" test. See 5 Collier on Bankruptcy ¶ 1129.02[7][a] (15th ed. 1995) for a discussion of the derivation of Section 1129(a)(7). The test provides that if a claim is impaired by a plan of reorganization, and if the holder of the claim has not accepted the plan, then the holder of the claim must receive on account of the claim "property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive ... if the debtor were liquidated under chapter 7 ... on such date." Both the bank's unsecured deficiency claim and its trade claims are impaired under the September 11 plan, as discussed later in this opinion, and the bank, as holder, has not accepted the plan. Therefore the plan must provide the bank with payments on its claims having a present value, as of the effective date of the plan, at least equal to the amount that the bank would receive on its claims if the debtor were liquidated in a Chapter 7 case on the plan's effective date.

■ There is no question that the plan's treatment of the bank's unsecured deficiency claim meets this test. In a Chapter 7 liquidation, the bank would receive nothing on account of this claim. The bank's note is nonrecourse, requiring it to look only to its collateral for payment. Thus, any claim for the deficiency, in Chapter 7, would be disallowed as unenforceable under applicable non-bankruptcy law, pursuant to Section 502(b)(1). The deficiency is an allowed claim in Chapter 11 only by operation of Section 1111(b)(1)(A). *In re Woodbrook Assocs.*, 19 F.3d 312, 318 (7th Cir.1994). No payment of the deficiency claim, then, is necessary to meet the best interests test.

■ The situation is different with respect to the trade debt. The bank contends that these claims would be paid in full, with interest, in a Chapter 7 liquidation, and thus that the treatment of these claims under the plan—payment in full without interest, 180 days after the effective date of the plan—violates the best interests test. In response, the debtor argues that, in a Chapter 7 liquidation, there would only be payment of the principal amount of the claims, and that it would take at least 180 days for that payment to be made. Each of these arguments fails to apply Section 1129(a)(7) properly to the facts of this case.

First, the bank is mistaken in asserting that interest would be paid on trade debt in a Chapter 7 liquidation of the debtor. The debtor here has only two significant tangible assets: its real property, and a $3.1 million cash account. If the debtor were liquidated in a Chapter 7 case, the following events would transpire:

(1) The trustee would abandon the real property pursuant to Section 554 because it

---

calls a commitment fee of $266,975, or such greater amount as the court may determine, up to $545,000 (1% of the total value of the bank's secured claim). The reason given by the debtor for paying the bank a smaller commitment fee than that required by the letter of intent is that GE Capital would need to engage in extensive due diligence in the course of committing to make the loan, while the bank, given its position as a present lender to the property and its in-

volvement in the pending bankruptcy, would not need to incur such expenses in connection with the plan. This observation appears well founded. Moreover, as noted above, even with the reduced commitment fee, the plan provides a substantially greater return to the bank than the terms of the letter of intent would provide to GE Capital. Accordingly, the court will not set a commitment fee higher than $266,975.

is fully encumbered, and its operation would be burdensome. In no event would the estate realize any value from the real estate.

■ (2) The $3.1 million cash account would be subject to distribution in payment of unsecured claims, pursuant to Section 726(a) of the Code, but it would be insufficient to pay these claims in full. The general unsecured claims against the estate include not only $160,000 in trade debt, but also $7.7 million in unsecured loans from insiders. Under Section 726, unsecured claims are not subject to different treatment simply because they are held by insiders. *Cf. In re Martin's Point Ltd. Partnership*, 12 B.R. 721, 727 (Bankr.N.D.Ga.1981) (allowing insider claims to be classified with other unsecured claims and noting that claims of equity holders are generally treated equally with those of other creditors); *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir.1990) (applying the rule of *Martin's Point* to prohibit separate classification of insider claims); 805 ILCS 210/804(1) (the Illinois enactment of Section 804 of the Revised Uniform Limited Partnership Act, under which claims of partners who are creditors of the partnership are treated equally with the claims of other creditors). Moreover, though the bank has questioned the assertion of the insider loans, it has not filed any objection to these claims, and they are deemed allowed, pursuant to Sections 1111(a) and 502(a). Accordingly, there is no reason to conclude that a Chapter 7 trustee would not treat the $7.7 million insider debt together with the $160,000 trade debt as claims to be paid under Section 726.

(3) Because the assets of the estate would be insufficient to pay the unsecured claims in full, a Chapter 7 trustee would pursue the assets of the general partner to the extent of the deficiency, pursuant to Section 723(a) of the Code. However, the Code distinguishes between the payment of claims and the payment of interest on claims. *Compare* 11 U.S.C. § 726(a)(1)–(4) (providing for "payment of claims") *with* 11 U.S.C. § 726(a)(5) (providing for "payment of interest ... on any claim paid under paragraph (1), (2), (3), or (4) of this subsection"). Section 723(a) affords the trustee a claim against the general partner only to the extent necessary to pay the claims, not to the extent necessary to pay interest on claims. Of the $7.7 million in insider claims, the general partner's claim is $6.8 million. Of this amount, the trustee would likely be able to offset a sufficient amount to allow payment in full of the principal amount of other unsecured claims.

(4) The estate would then be closed with payment in full of all claims but that of the general partner, and partial payment to the general partner.

(5) Because all claims against the estate would not be paid in full, there would be no payment of interest on any unsecured claim, since payment of interest is made under Section 726(a)(5) only after payment of all allowed unsecured claims. The bank's assertion to the contrary is incorrect.

■ The debtor's mistake in the application of Section 1129(a)(7) is in asserting that payment of liquidation value may be delayed until the payment would likely be made in a Chapter 7 case. To the contrary, Section 1129(a)(7) directs that value be determined as if the debtor were "liquidated" on the effective date of the plan. Although "liquidate" is not defined in the Code, its ordinary meaning, in a financial context, is "[t]o pay off or settle (a debt, claim or obligation)" or "[t]o settle the affairs of (a business firm, for example) by determining the liabilities and applying the assets to their discharge," or, at the very least, "[t]o convert (assets) into cash." The American Heritage Dictionary 735 (2d College ed. 1982). The effect, then, of specifying that a liquidation value be assessed as of the effective date of the plan is to make certain that the creditors be given, as of that date, the value that they would have at the conclusion of the Chapter 7 process. And so, by delaying payment in full of the trade creditors claims for 180 days, the debtor's plan does violate the best interests test.

■ However, this is not a particularly significant violation. It appears that the debtor has ample cash available to pay all of the trade debt on the effective date of the plan. If the debtor nevertheless wishes to delay payment until after the effective date (perhaps to consider claim objections), it

would have to pay interest to the trade creditors for the period of the delay. But since there is no substantial risk that the payment will not be made (the debtor having cash on deposit well in excess of the amount owed, and the delay in payment being brief), interest at a comparable Treasury rate would be sufficient. The interest required for a 180 day delay in paying the $90,000 in trade debt not held by insiders of the debtor would be no more than $3000. The court will therefore allow confirmation of the September 11 plan, over the bank's "best interests" objection, but only if the debtor modifies the plan, pursuant to Section 1127(a), so as to comply with Section 1129(a)(7). *Cf. Travelers Ins. Co. v. KCC–Leawood Corporate Manor I*, 908 F.2d 343 (8th Cir.1990) (dismissing appeal from conditional confirmation order).

### *Objection 3: Section 1129(b)(1)— unfair discrimination.*

■ The best interests test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan. The bank's next objection—that the plan unfairly discriminates—is different. The prohibition against unfair discrimination applies only when a debtor seeks to confirm a plan despite the failure of an entire class to accept the plan. Section 1129(b)(1) provides that the plan may be confirmed against the nonaccepting impaired class (*i.e.*, "crammed down"), only if "the plan does not discriminate unfairly ... with respect to each class of claims ... that is impaired under, and has not accepted, the plan." As required by *In re Woodbrook Associates*, 19 F.3d 312, 319 (7th Cir.1994), the debtor placed the deficiency claim of the bank in a class separate from the other general unsecured claims. The deficiency claim is impaired, and the bank did not accept the plan. Therefore, the deficiency claim may not be subject to unfair discrimination.

■ Unquestionably, the September 11 plan discriminates between the deficiency claim and the trade debt. As noted above, the trade debt is to be paid in full, shortly after confirmation; the deficiency claim is to be paid only upon sale or refinancing of the property, and only from half the net proceeds

(the other half going to pay participation interest on the bank's secured claim). If the sale or refinancing takes place in 10 years, at the value found by the court, the deficiency claim would be paid about $19 million, half of the claim. If this payment is discounted at the same 12% rate used to value the building, the dividend on the claim is only about 16%. The question is whether this discrimination (full payment of trade debt versus 16% payment of the unsecured deficiency) is unfair.

■ Answering this question is made difficult by the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan. Given the language of Section 1129(b)(1), some discrimination between classes of unsecured claims must be permissible. *In re Aztec Co.*, 107 B.R. 585, 588–89 (Bankr.M.D.Tenn.1989) (rejecting decisions holding that "all unsecured claimholders must be paid the same percentage of claims" because "Section 1129(b)(1) prohibits only 'unfair' discrimination, not all discrimination."). However, the limits of fairness in this context have not been established. The debtor originally suggested that the court apply a four-part test that was developed in applying Section 1322(b)(1), a parallel prohibition of "unfair discrimination" for Chapter 13 plans. However, that test is unworkable, for the reasons set forth in *In re Brown*, 152 B.R. 232, 235–37 (Bankr.N.D.Ill.), *rev'd on other grounds, sub nom. McCullough v. Brown*, 162 B.R. 506 (N.D.Ill.1993). At the same time, the alternative test applied in *Brown*, 152 B.R. at 237–39, was specifically grounded in the context and the legislative history of Chapter 13, and has no application to Chapter 11. The Seventh Circuit, in finding that the plan in *In re Woodbrook Associates*, 19 F.3d 312, 317–320 (7th Cir.1994), involved unfair discrimination, stated only that the plan provided a 5% distribution to the unsecured deficiency claim of a mortgagee while paying insiders of the debtor in full. The court did not discuss its general understanding of unfair discrimination.

■ Nevertheless, it is possible at least to lay a framework for measuring the fairness of a discrimination in Chapter 11 plans. First, any discrimination must be supported

by a legally acceptable rationale. The result in *Woodbrook* can be seen as flowing from the failure of the debtor, as plan proponent, to give any rationale for discriminating against the mortgagee's deficiency claim and in favor of insiders. In contrast, the court in *In re Creekstone Apartments Associates, L.P.,* 168 B.R. 639, 644 (Bankr.M.D.Tenn. 1994), found that "[p]rotection of the debtor's creditor-worthiness with its vendors," as asserted by the debtor, was an acceptable rationale for discrimination in favor of trade creditors. Second, the extent of the discrimination must be necessary in light of the rationale. Again, the extreme disproportionality between the payments to insiders and to the deficiency claim of the mortgagee contributed to the finding of unfair discrimination in *Woodbrook,* and a similar disproportionality contributed to a finding of unfair discrimination in *In re Creekside Landing,* 140 B.R. 713, 716 (Bankr.M.D.Tenn.1992).

Within this framework, the debtor's plan does not unfairly discriminate. First, the debtor has provided a compelling rationale for the discrimination in its treatment of unsecured claims: the best interests test. As discussed above, this test, set forth in Section 1129(a)(7) of the Code, requires that the debtor pay holders of impaired claims as much as they would have received in a Chapter 7 liquidation, and, in a Chapter 7 liquidation, the trade creditors in the present case would be paid in full. Thus, full payment of these claims under the debtor's plan was required for confirmation. On the other hand, the deficiency claim would be paid nothing in a Chapter 7 case, and so the best interests test does not mandate payment of this claim at any particular level. Since the debtor does not now have sufficient funds to pay all of its creditors in full, and is unlikely to have sufficient funds during the course of its plan, some creditors—other than holders of trade debt—must be paid less than 100% of their claims.

Second, the discrimination in the debtor's plan is narrowly tailored to meet the requirements of the best interests test: the trade creditors are paid no more than the face amount of their claims, and all insider claims are either waived or subordinated to the bank's deficiency claim, allowing that claim to be paid in full before insiders of the debtor receive any payment under the plan. It is not clear that this degree of deference to the bank's deficiency claim would be required; valid insider claims may well have been paid on a par with the deficiency claim without unfair discrimination. However, the discrimination in the present plan, which, far from favoring insiders, subordinates them, cannot be seen as unfair to the deficiency claim.

### Objection 4: Section 1129(b)(2)(B)— absolute priority and new value.

■ Just as Section 1129(b)(2)(A) sets forth minimum standards for applying the "fair and equitable" standard to secured claims in cram down, Section 1129(b)(2)(B) sets forth the minimum standards for "fair and equitable" treatment of unsecured claims. This minimum standard is the "absolute priority rule": unless each claim in a nonaccepting class of unsecured claims is paid in full (*i.e.,* given "property of a value, as of the effective date of the plan, equal to the allowed amount of such claim"), the plan must provide that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B).

The bank argues that this provision is violated with respect to its deficiency claim. This claim, as noted above, will not be provided full payment under the debtor's plan. Nevertheless, holders of partnership interests in the debtor—which, as equity, are junior to the bank's claim—do receive property under the plan: retention of their ownership of the debtor, with the right to participate in the proceeds of any sale or refinancing of the property (albeit subordinated to the deficiency claim). The question is whether this retention of ownership is "on account of" the interests that the partners had at the outset of the case, or whether the retention of ownership is on account of the new capital contributions that the plan requires partners to make. A further question is whether, even if the new contributions are seen as the cause for the

debtor's partners continuing to have partnership interests, the right to retain these interests in exchange for the new contributions is itself property that the partners receive on account of their prepetition interests.

These "new value" questions have been discussed in a large number of sharply divided opinions and commentary. The United States Supreme Court issued an opinion noting the question whether contributions of new value can ever support retention of ownership interests where creditors of the estate receive less than full payment, but expressly leaving the question open, and holding only that if new value can have this effect, it must be in the form of money or money's worth, rather than a promise to provide labor to the debtor. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 203 n. 3, 108 S.Ct. 963, 967 n. 3, 99 L.Ed.2d 169 (1988). The Seventh Circuit likewise has raised the question several times, but declined to rule on it. One opinion of the court, *Kham & Nate's Shoes No. 2, Inc. v. First Bank*, 908 F.2d 1351, 1359–62 (7th Cir.1990), presents a number of arguments against allowing retention of ownership through contribution of new value, but the opinion declines to reach the question, holding instead that the guarantees proposed to be contributed by the debtor's owners would be insufficient in any event. Another decision of the court, *In re Snyder*, 967 F.2d 1126, 1128–31 (7th Cir.1992), presents arguments in favor of allowing retention of ownership based on contribution of new value, but again declines to reach the question, holding that the bankruptcy court had not committed error in finding the $30,000 contribution proposed in that case to be insufficiently "substantial." Among decisions from other jurisdictions that actually do reach the issue, *In re A.V.B.I.*, 143 B.R. 738 (Bankr. C.D.Cal.1992), thoroughly presents the arguments against allowing retention of ownership based on contribution of new value, and *In re Bonner Mall Partnership*, 2 F.3d 899 (9th Cir.1993), thoroughly presents the contrary view.

This court is persuaded by the arguments advanced in *Bonner Mall* and *Snyder*, and will only summarize them here very briefly.

The salient points are: (1) the language of Section 1129(b)(2)(B) cannot unambiguously be applied in the context of a contribution of new value by the debtor's owners; (2) given this genuine ambiguity, it is appropriate to look at pre-Code practice for aid in interpretation; (3) prior to the adoption of the Code, and particularly after *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939), the availability of the "new value" approach to reorganization was generally recognized; (4) nothing in the legislative history of the Code, or the language of the Code itself, gives any clear indication that Congress intended to eliminate the new value approach. Accordingly, Section 1129(b)(2)(B) should be interpreted to allow retention of ownership interest "on account of" a contribution of new value, consistent with the requirements that the courts have imposed on this approach.

In *Snyder*, the court applied in effect a four-factor test for retention of ownership on account of a new value contribution. Citing *Los Angeles Lumber*, 308 U.S. at 121–122, 60 S.Ct. at 10, the court stated: "[A] qualifying new value contribution must be (1) necessary to the reorganization; (2) in the form of money or money's worth; and (3) reasonably equivalent to the interest retained." *Snyder*, 967 F.2d at 1131. The court added a fourth factor, that the contribution be "substantial," based on decisions rendered subsequent to *Los Angeles Lumber*. *Id.* Later, in *In re Woodbrook Associates*, 19 F.3d 312, 320 (7th Cir.1994), the court commented further on the substantiality requirement, implying that substantiality serves as something of a summary of the other factors:

> Simply put, "substantiality" requires that the contribution be real and necessary to the successful implementation of a feasible plan.... A token cash infusion violates the absolute priority rule because the old equity owners are receiving the opportunity to purchase the new equity interest at a bargain price "on account of" their prepetition ownership.

Whether the infusion of new capital is "substantial" is more a common sense determination than a mathematical calculation when the debtor comprises only a

single real estate asset which is fully encumbered.

The three *Los Angeles Lumber* factors are satisfied by the new value proposed to be contributed under the debtor's September 11 plan. First, the contribution is necessary to the reorganization. The contribution was an essential ingredient in allowing a market rate of return to the bank's secured claim. Although the bank argues that the plan still will not succeed, the contribution is necessary for any attempt at reorganization. Second, the contribution is at least partly in the form of money or money's worth: cash and promissory notes secured by a letter of credit, with a present value of $4.1 million as of plan confirmation. The parties dispute whether the last three scheduled contributions should be counted as "money's worth," but that dispute is not material here.[5] Third, the contribution is easily the equivalent of the interests retained by the debtor's partners. Indeed, on the market, those interests are worthless. Even after ten years of successful operation of the property under the September 11 plan, the entire proceeds of a sale or refinancing are projected to go to the bank. The debtor's partners thus seek to retain their interests not because of the intrinsic value of these interests, but because of the tax consequences that flow from their loss.

Rather than the three *Los Angeles Lumber* factors, it is the fourth new value factor—substantiality—that is principally in dispute here. The bank argues that the $4.1 million present value of the presently assured contributions should be compared to the total amount of unsecured debt, $58 million, making the contribution about 7% of the unsecured debt. The bank then points to decisions in which proposed new value contributions of between 2 and 6% of unsecured claims were found to be insubstantial. (In *Snyder*, the proposed contribution was 2.7% of total unsecured claims, 967 F.2d at 1131; in *Woodbrook*, the ratio was "at most" 3.8%, 19 F.3d at 320). The bank's argument is misguided in two respects. First, the total unsecured claims are not relevant here, since many of these claims belong to the general partner or an entity that it controls, and these insider claims have either been waived or subordinated to the bank. Similarly, the noninsider trade debt is paid in full under the plan. Thus, the only unsecured claim that is being involuntarily "primed" by the partners' retention of equity is the deficiency claim of the bank, in the amount of $38,469,112. The proposed new value contribution is about 10.7% of this amount. Second, and more significantly, percentage comparisons of contribution value to unsecured claims are not dispositive. In *Snyder*, the Seventh Circuit cautioned that "there is no mathematical formula for resolving the substantiality issue, and it will depend on the circumstances of the individual case." 967 F.2d at 1131–32. And in both *Woodbrook* and *Snyder*, the court emphasized that the determination of substantiality "may not always hinge on a comparison of the proposed contribution to the total amount of unsecured debt." Here, the new value being contributed by the partners is substantial both in absolute terms and in its impact in this case. The $4.1 million minimum value of the contribution in this case dwarfs the $30,000 involved in *Snyder* and the $100,000 in *Woodbrook*. It constitutes over 20% of the tax liability the partners hope to avoid. And, most significantly, the total contribution package, however valued, is substantial enough to make possible a commercial loan on the debtor's property consistent with the terms of the proposed plan. That plan, in turn offers a substantial (16%) return on the bank's deficiency claim. The new value contributions proposed by the September 11 plan are not mere tokens, but genuine contributions to the proposed plan.

In all, the plan treats the unsecured claims held by the bank, both trade claims and the unsecured deficiency claim in a manner consistent with the requirements of Section 1129.

### C. General requirements for confirmation.

In addition to specifying minimum standards for the treatment of claims, Section

---

**5.** Similarly, it is not necessary to determine whether the waiver by the general partner of $6.9 million in general unsecured claims constitutes money's worth.

1129 sets forth a number of general requirements for confirmation. The bank asserts that the debtor has failed to establish compliance with several of these general requirements.

*Objection 5: Sections 1129(a)(1), 1123(b)(6), 365(c)(2)—forced relending.*

█ At the outset of the hearing on confirmation of the September 11 plan, the plan contained a provision requiring the bank to relend to the debtor, at the debtor's request, any payments made by the debtor in excess of scheduled amortization, to the extent these funds were reasonably needed for alterations to the property, tenant improvements, and leasing commissions. The plan also had a provision for judicial resolution of disputes in the event the bank objected to any request by the debtor for such relending. After the bank objected to these provisions during the hearing, the debtor submitted a modified plan, omitting them. The plan, as currently proposed, specifies only (1) that the debtor may request relending, (2) that if the bank fails to respond within 10 business days after receipt of the request, the bank will be deemed to have agreed to it, and (3) that if the bank refuses the request, the bank must set forth its grounds for so doing. The plan now explicitly provides that the Bank has sole discretion regarding the granting of the request, and the procedure for court resolution of a dispute between the parties on this issue has been eliminated.

Nevertheless, the bank contends that the relending provisions violate Section 365(c)(2) of the Code, which provides that a trustee (and hence a debtor in possession, pursuant to Section 1107(a)) may not "assume or assign any executory contract ... if ... such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor." Of course, even as originally drafted, the September 11 plan did not purport to assume any existing loan agreement with the bank. It sought to create a new obligation on the part of the bank to extend a kind of revolving credit line. Hence, Section 365(c)(2) does not apply by its terms. Rather, the bank argues that the spirit of Section 365(c)(2) is to prevent creditors from being required to lend money involuntarily to debtors. Then, because Section 1123(b)(6) only allows a plan to include provisions "not inconsistent with the applicable provisions" of the Code, the bank contends that the debtor has exceeded its authority under Section 1123. Ultimately, such an improper provision in a plan would violate Section 1129(a)(1), which requires that a plan comply with the applicable provisions of the Code.

It is not necessary here to analyze all the steps of the bank's argument, since the argument is flawed at its premise. The September 11 plan imposes no obligation on the bank to make any loan. The only obligation imposed is to make a reasonably prompt response to a loan request, with a specification of reasons for a denial. Clearly, the debtor still hopes to establish a revolving loan arrangement with the bank, and the plan sets up the mechanism for such an arrangement. However, in the event the bank chooses not to accept this arrangement, it is given sole discretion to reject it. In this way, the debtor's revised plan tracks the terms of the letter of intent with GE Capital. That letter, like the current plan, created the structure for a revolving loan arrangement based on excess amortization payments, but gave the lender sole discretion in extending financing under that structure.

Creating this structure is not inconsistent with the Bankruptcy Code. Under Section 1123(b)(6), a debtor is affirmatively authorized to include in a plan general provisions that are not inconsistent with other provisions of the Code. *See In re Trans World Airlines, Inc.,* 185 B.R. 302, 313 (Bankr. E.D.Mo.1995) (confirming a plan containing numerous provisions pursuant to Section 1123(b)(6)). No provision of the Code is inconsistent with a plan requiring that the debtor's principal secured creditor respond with reasonable promptness and specificity to a request from the debtor for financing. Indeed, such a requirement is quite sensible: a prompt response from the bank to a request by the debtor for financing from excess amortization will give the debtor the opportunity to correct any problems with its request if the bank is willing to consider the financ-

ing requested, or to make alternative arrangements if the bank will not consider the financing.

*Objection 6: Section 1129(a)(3)—good faith.*

■ Section 1129(a)(3) of the Code requires that any Chapter 11 plan be proposed in good faith. The bank argues that the debtor's motivation for filing its plan—avoidance of adverse tax consequences—in itself establishes that the plan was proposed in bad faith, particularly in the context of a single asset real estate case.

This argument is not consistent with governing law. First, the fact that this is a single asset real estate case does not render it a bad faith filing. The Bankruptcy Code contains no provision to this effect, and, to the contrary, was recently amended to deal specifically with certain single asset real estate cases. See 11 U.S.C. §§ 101(51B) (defining "single asset real estate") and 362(d)(3) (providing special grounds for relief from the automatic stay in single asset real estate cases), each added to the Code by Section 218 of the Bankruptcy Reform Act of 1994. *See also In re James Wilson Assocs.,* 965 F.2d 160 (7th Cir.1992) (affirming confirmation of Chapter 11 plan in single asset real estate case). The Supreme Court itself has rejected the notion that Chapter 11 is limited to a particular type of business reorganization in holding that individuals are eligible for Chapter 11 relief. *Toibb v. Radloff,* 501 U.S. 157, 161, 111 S.Ct. 2197, 2199–2200, 115 L.Ed.2d 145 (1991).

■ Second, the bank's focus on the debtor's intent in filing the case is inappropriate. In *In re Madison Hotel Associates,* 749 F.2d 410, 425 (7th Cir.1984), the court interpreted Section 1129(a)(3) as focusing on the content and effect of the plan under consideration, not the subjective motivation of the plan proponent:

> [F]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

*Accord, In re Andreuccetti,* 975 F.2d 413, 420 (7th Cir.1992). The evidence presented at the confirmation hearing is consistent with this standard of good faith. The debtor has proposed a plan which sets forth an effort to pay noninsider claims (including the bank's deficiency claim) as much or more than they would receive in a liquidation. It delays any payment of insider claims until the sale or refinancing of the property, and then makes that payment subordinate to the bank's deficiency claim. It provides significant protection to the bank's secured claim. Its discrimination among unsecured claims, as discussed above, is reasonable. In proposing the terms of its plan, the debtor was admittedly motivated by fear of adverse tax consequences in the event a plan were not confirmed, but this has no effect on the operation of the plan.

■ Finally, even if the bank's challenge were considered as a request for relief based on bad faith in the debtor's *filing* of the case, an issue not particularly relevant to confirmation, the motivation of avoiding adverse tax consequences would still fail as evidence of bad faith. *In re Cadwell's Corners Partnership,* 174 B.R. 744, 762 (Bankr. N.D.Ill.1994). Few bankruptcies, likely, are filed with altruistic intent; every debtor presumably files to obtain some benefit for itself or avoid some harm. *In re James Wilson Assocs.,* 965 F.2d 160, 170 (7th Cir.1992) ("It is not bad faith to seek to gain an advantage from declaring bankruptcy—why else would one declare it?"). In its most general formulation, the standard for good faith in filing simply requires that, in pursuing its own interests, the debtor act with "fundamental fairness" and "in a manner that complies with the spirit of the Bankruptcy Code's provisions." *In re Love,* 957 F.2d 1350, 1357 (7th Cir.1992). Thus, unnecessary bankruptcies filed by debtors who can pay their creditors in the ordinary course, useless bankruptcies filed without prospect for reorganization, and harassing bankruptcies filed as part of a pattern of delay or misconduct, are found to be filed in bad faith. *In re N.R. Guaranteed Retirement, Inc.,* 112 B.R. 263 (Bankr.N.D.Ill.), *aff'd* 119 B.R. 149 (N.D.Ill.1990) (discussing

specific circumstances leading to findings of bad faith filing).

In the present case, none of these circumstances exist. At the time of the filing of this case, the debtor was genuinely in need of bankruptcy relief, with an expired mortgage and a pending foreclosure action. At the same time, given the quality and substantial cash flow of the debtor's property, there was a genuine prospect for reorganization, as reflected in this opinion. And there has been no pattern of delay here: the bankruptcy case was filed shortly after the mortgage became due, and it has proceeded expeditiously, with the debtor meeting all court-imposed deadlines.

*Objection 7: Section 1129(a)(5)—*
*quality of management.*

Section 1129(a)(5) of the Code imposes, as a requirement for confirmation, (1) that there be disclosure of any individual proposed to serve, after confirmation, "as a director, officer, or voting trustee of the debtor," and (2) that the holding of office by each such individual "is consistent with the interests of creditors and equity security holders and with public policy." The bank asserts that this provision has not been complied with in the present case, because the debtor's management, prior to the bankruptcy filing and contrary to its agreement with the bank, made a deposit of rents that would otherwise have been used to pay real estate taxes into an account at another bank. The bank contends that the nonpayment of real estate taxes constitutes waste under Illinois law, and that a willingness to engage in such nonpayment makes the continuation of current management contrary to the interests of creditors. The bank also asserts that changes in management personnel since the filing of this case further call into question the quality of the debtor's management. In support of its arguments, the bank cites *In re Rusty Jones, Inc.,* 110 B.R. 362, 375 (Bankr.

N.D.Ill.1990), and *In re SM 104 Ltd.,* 160 B.R. 202, 245 (Bankr.S.D.Fla.1993).

The cited cases, however, presented factual situations very different from the present one. In each, the debtor's management had engaged in a pattern of conduct detrimental to creditors, including, in the *SM 104* case, deliberate violations of court orders and potentially fraudulent misrepresentations. Thus, *Rusty Jones* and *SM 104* are consistent with the apparent intent of Section 1129(a)(5) to preclude continued service by prior management "if it directly or indirectly perpetuates incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor." *In re Polytherm Indus., Inc.,* 33 B.R. 823, 829 (W.D.Wisc.1983). Here, the bank points to a single transfer, which involved no conversion, but simply retained funds in the control of the debtor, and which was disclosed in the debtor's schedules. The transfer was an error in judgment—it exposed the debtor to tax penalties unnecessarily, and it was unlikely to achieve its intended purpose of advancing settlement discussions with the bank. However, the transfer is not indicative of a general course of conduct prejudicial to creditors. Moreover, the representative of the debtor who authorized the transfer testified without contradiction to extensive experience in managing commercial real estate successfully. *Cf. In re Landing Assocs., Ltd.,* 157 B.R. 791, 817 (Bankr.W.D.Tex.1993) (confirming Chapter 11 plan over objection to continued management "in light of the vast experience" of the individuals employed by the debtor in managing real estate).[6]

Finally, the fact that the on site personnel employed by the debtor's management decided to accept new employment pending confirmation of this case is hardly evidence that the management company is incompetent. Given the uncertainty of the outcome of the case, and the potential for foreclosure followed by loss of employment, it is understandable that the onsite personnel

---

**6.** The bank also argues that Section 1129(a)(5) is violated because the management firm employed by the debtor is paid a management fee of 4% instead of the 3% rate that the bank believes is appropriate. However, Section 1129(a)(5)(B) provides only that the identity and compensation

of insiders to be employed by the debtor be disclosed, not that it be approved by the court. *In re All Seasons Indus., Inc.,* 121 B.R. 822, 826 (Bankr.N.D.Ind.1990). In any event, the evidence presented at the confirmation hearing indicates that the 4% rate is not unreasonable.

would take the action that they did. However, with plan confirmation, there is no reason to doubt that debtor's management will be able to hire competent replacements.

### Objection 8: Section 1129(a)(10)— acceptance by an impaired class.

■ Whenever a Chapter 11 plan impairs a class of claims, another requirement for confirmation is that "at least one class of claims that is impaired under the plan has accepted the plan." 11 U.S.C. § 1129(a)(10). The debtor seeks to satisfy this requirement by pointing to the affirmative vote of a class of general unsecured creditors.[7] However, the bank argues that this class's vote does not satisfy the requirement of Section 1129(a)(10) because the class was "artificially" impaired.

As the term relates to Chapter 11 plans, "impairment" is defined by Section 1124 of the Code. This section provides, with an exception not relevant here, that every class of claims is impaired, "unless, with respect to each claim ... of such class" the plan either (1) "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest" or (2) reverses the acceleration of an indebtedness caused by default, through a defined cure process, and otherwise leaves the rights of the holder of the claim unaltered. Until recently, Section 1124 contained a third ground for finding a claim unimpaired: that "on the effective date of the plan, the holder of such claim ... receives, on account of such claim ... cash equal to ... the allowed amount of such claim." This third ground might have applied to debtor's plan, depending on how the plan was modified to comply with the best interests test.

However, the third ground of nonimpairment was deleted by Section 213(d) of the Bankruptcy Reform Act of 1994, Pub.L. 103–394, effective as to cases filed on or after October 22, 1994.

■ Under current law, the debtor's plan plainly does impair the class of general unsecured claims. The creditors holding these claims are, at the very least, delayed in the right to payment that existed under their agreements with the debtor, and they are not provided interest to which they would otherwise be entitled.[8] However, the bank contends that this impairment is "artificial" and hence should not be recognized, because the debtor had the ability to pay the unsecured creditors, in full, with interest, at the time of the confirmation hearing.

The leading case for denying confirmation on the ground of artificial impairment is *In re Windsor on the River Associates,* 7 F.3d 127 (8th Cir.1993). *Windsor* was a single asset real estate case in which the secured creditor's claim was oversecured by the debtor's property, and in which the debtor's plan provided that a class of trade creditors would be paid 60 days after the effective date of the plan. The delay in payment effected an impairment under Section 1124, but the Eighth Circuit refused to recognize this impairment. The court held that, "for purposes of 11 U.S.C. § 1129(a)(10), a claim is not impaired if the alteration of rights in question arises solely from the debtor's exercise of discretion." 7 F.3d at 132. Then, because it would have been possible for the debtor to have structured the plan so as to pay the trade debt in full on the effective date, leaving the secured creditor as the only impaired creditor, the court found that an "arbitrary manipulation" of claims had taken place. 7 F.3d at 132–33.

---

7. If the bank's deficiency claim had been included in this class, its vote against confirmation would have resulted in the class not accepting the plan. However, as noted above, the bank's deficiency claim was placed in a separate class, as required by *In re Woodbrook Assocs.,* 19 F.3d 312, 317–320 (7th Cir.1994) (separate classification of the deficiency claim of a nonrecourse secured creditor is not only permitted, but required, in light of the unique legal status of such a claim).

8. Under Illinois law, even in the absence of a contractual provision, interest is payable on liquidated debts. 815 ILCS 205/2 (1994); *Premier Elec. Const. Co. v. American Nat. Bank,* —— Ill. App.3d ——, 212 Ill.Dec. 4, 14, 656 N.E.2d 157, 167 (1995) ("Under Illinois law, absent an express contract provision allowing interest at a specific rate, a party is only entitled to prejudgment interest at the statutory rate from the date payment is due to the date of entry of the judgment.")

*Windsor* thus requires the denial of confirmation in any case where it would be possible to structure a plan without an approving impaired class. This rule has been rejected by the Ninth Circuit Bankruptcy Appellate Panel as unsupported by the language of the Code, and as inconsistent with the Code's policy of flexibility in plan formulation. *In re Hotel Assocs. of Tucson*, 165 B.R. 470, 475 (9th Cir. BAP 1994); *accord, In re Beare Co.*, 177 B.R. 886 (Bankr.W.D.Tenn.1994). And even courts that find *Windsor's* rationale persuasive have not applied its rule that impairment under Section 1129(a)(10) must be unavoidable. Rather, these cases have found artificial impairment only where there is no reason for the impairment other than obtaining compliance with Section 1129(a)(10). *In re Investors Florida Aggressive Growth Fund, Ltd.*, 168 B.R. 760, 766 (Bankr. N.D.Fla.1994) (denying confirmation where compliance with Section 1129(a)(10) was "the only purpose for the impairment of a class"); *In re North Washington Center Ltd. Partnership*, 165 B.R. 805, 810 (Bankr.D.Md. 1994) (denying confirmation where the debtor had "absolutely no reason" for impairing the only accepting class of creditors). Consistent with this view of artificial impairment, the court in *In re Rivers End Apartments, Ltd.*, 167 B.R. 470, 479 (Bankr.S.D.Ohio 1994), confirmed a Chapter 11 plan over an artificial impairment objection because the debtor made a showing that impairment of unsecured claims (by delay in payment) was desirable for business purposes—even though it was not essential—leading the court to find that the delay was "not proposed solely to achieve impairment."

■ Thus, there appears to be a developing consensus among the decisions that the "artificial impairment" objection is best seen, not as a ground for finding noncompliance with Section 1129(a)(10), but as an argument that a plan has not been proposed in good faith, a separate requirement for confirmation under Section 1129(a)(3), discussed above. This consensus is responsive both to the language of the Code and to the concerns reflected in *Windsor*. As the Bankruptcy Appellate Panel suggests in *Hotel Associates of Tucson*, it is difficult to hold that a class should not be counted as "impaired," when, by the definition of Section 1124, it plainly is impaired. 165 B.R. at 474. On the other hand, courts should not be required to accept manipulation of the confirmation process, by debtors carving out classes that are likely to confirm the plan, and then treating those classes in a manner that technically impairs them but provides significant incentives to approve the plan. Where such manipulation occurs, it should result in a denial of confirmation under the good faith requirement. *In re Beare Co.*, 177 B.R. at 889 ("[G]ood faith under § 1129(a)(3) is the real issue to be decided, not impairment.").[9]

In the present case, there is no lack of good faith in the system of classification and payment set forth by the debtor's plan. The debtor's operations are not anticipated to generate sufficient income to pay all unsecured claims in full, with interest. Therefore, the debtor had to impair claims. The debtor addressed this situation in a manner that is highly favorable to the noninsider creditors by providing for payment of the principal of all noninsider claims before any payment of insider claims. Presumably, the debtor could have arranged for payment of the trade debt with interest from the time of filing (thus reducing the funds payable to the bank on its unsecured deficiency claim), but nothing in the Code requires such treatment, particularly when it would result in denial of confirmation for lack of an accepting impaired class.

The plan has been accepted by an impaired class, and there is no lack of good faith in the debtor's failure to pay that class interest on its claims.

### Objection 9: Section 1129(a)(11)— feasibility.

■ The final objection made by the bank is that the debtor's plan fails to meet

---

9. The debtor argues that the bank lacks standing to make an artificial impairment argument because it is not a member of the allegedly impaired class. Since the real thrust of the artificial impairment argument is a challenge to good faith under Section 1129(a)(3), the bank plainly has standing to make the argument. *See Big Shanty Land Corp. v. Comer Properties, Inc.*, 61 B.R. 272, 280 (N.D.Ga.1985) (holding that a creditor of estate has standing to raise good faith argument and that the court has an independent duty to examine good faith in any event).

the requirement of Section 1129(a)(11) that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor ... unless such liquidation or reorganization is proposed in the plan." This provision is commonly referred to as the "feasibility" test. *See* 5 Collier on Bankruptcy ¶ 1129.02[11] (15th ed. 1995) (discussing the derivation of Section 1129(a)(11)). The language of the subsection clearly establishes its reach: "[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed." *Kane v. Johns–Manville Corp.,* 843 F.2d 636, 649 (2d Cir.1988). One recent district court opinion summarized the case law interpreting Section 1129(a)(11) as follows:

> A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable. The prospect of financial uncertainty does not defeat plan confirmation on feasibility grounds since a guarantee of the future is not required. The mere potential for failure of the plan is insufficient to disprove feasibility.

*In re Patrician St. Joseph Partners Ltd. Partnership,* 169 B.R. 669, 674 (D.Ariz.1994) (citations omitted).

Under this standard, the September 11 plan is plainly feasible. The projected cash flow set out in the court's findings of fact is sufficient to pay all of the debtor's anticipated expenses, together with required debt service to the bank, for 6 years. Indeed, at the end of that period, the cash flow found by the court will result in "excess" cash flow, in an amount of nearly $7.5 million, paid on the principal of the new note, leaving a loan balance of $43.5 million, even if the debtor's partners fail to make the last three capital contributions required under the plan. See Debtor's Supplemental Post–Trial Memorandum, filed November 3, 1995, Exhibit D. If all of the capital contributions are made, the loan balance would be $41.5 million. *Id.,* Exhibit C. During the seventh year of the plan, due to anticipated expenses in connection with the renewal of the largest tenant's lease, the projected cash flow is not sufficient to make the required debt service. This situation continues in the eighth year of the plan, albeit to a much smaller extent. In the ninth and tenth years of the plan, projected cash flow once again substantially exceeds the amount needed for required debt service.

The bank contends that this situation shows a lack of feasibility, since, as discussed above, the debtor cannot require the bank to relend any of the excess amortization payments at the time of the anticipated shortfalls in cash flow. However, the debtor's inability to force a loan from the bank does not imply failure of the plan. In the situation outlined above, it is likely that the bank will make the loan willingly. The bank would have enjoyed six years of successful operation of the property, and would, at the time of the request for relending, have a debtor with stable income prospects and a defined short term cash flow shortage. Not only would the bank be given a generous return on the short term lending, the ultimate effect of the lending would be to increase the debtor's equity in the property, which equity would inure completely to the bank through participation interest and payment of its unsecured deficiency claim.

Alternatively, the debtor would have the option of selling the property and prepaying the loan without penalty. The experts of each party testified to an improving market for office buildings in the Chicago central business district.

Finally, if the anticipated cash shortfall in the seventh year of the plan cannot be made up by the debtor, there will still be no "liquidation, or the need for further financial reorganization of the debtor." The debtor's plan itself provides for a consensual transfer of the property to the bank in the event of default, and, this feature of the plan is likely to be enforced in any subsequent bankruptcy proceeding.

The debtor has established the feasibility of its plan.

## Conclusion

For the reasons set forth above, the court finds that the debtor has established that its September 11 plan complies with all of the applicable requirements of Section 1129 except for Section 1129(a)(7). That deficiency may be remedied either by paying trade

creditors in full on the effective date of the plan, or by paying them interest at a comparable treasury rate during the period of any delay in payment. Upon modification of the plan to effect one of these changes, the court will enter an order of confirmation.